## C. ED. ANDERSON ET AL. v. A. S. WALKER, COUNTY JUDGE, ET AL.

### No. 795.  Decided November 20, 1899.

**1.  False Statement—Estoppel—Who May Assert.**

Whatever moral wrong or fraudulent purpose may be involved in a false statement, only one who will suffer legal injury from its falsity can assert it as an estoppel against proof of the truth.  (P. 126.)

**2.  Same—County Treasurer—Examination of Funds—Bank Deposit.**

In order that statements by a bank as to the amount of county funds a treasurer had on deposit, made to a finance committee appointed by the district court to examine his accounts, should estop the bank from denying that it so held the amount represented, it should appear that the statement in question came to the knowledge of the authorities representing the county and influenced them to take or omit some action by reason of it, and that the county had sustained loss of its money in consequence of the representation.  (Pp. 125-128.

**3.  Same.**

Allegation of failure of the grand jury in consequence of such representations to indict the defaulting treasurer or prevent his continuance in office, does not establish such loss to the county, nor can the court supply by inference an allegation that the county officers, if not so deceived, might have secured some redress.  (P. 127.)

**4.  Bank—County Treasurer—Deposit—Credit—Application to Individual Debt.**

When a bank took the note of a county treasurer, placing the amount to credit of his official deposit as a loan to make good his defalcation, and at the same time a check on such deposit to enable the bank to apply the same amount in turn to the discharge of his note, if the credit to his deposit was in effect a loan to make good temporarily a defalcation of the treasurer, the title of the county attached to it, and the application of it by the treasurer's check to pay the note, his individual debt, was unauthorized.  (Pp. 128-130.)

**5.  Same.**

But if the intent of the treasurer and the officers of the bank was to fabricate evidence to conceal the former's defalcation, with no intent that any real right in

the county should result, the bank would not become liable to the county without some element of estoppel in the transaction.  (P. 130.)

**6.  Same.**

Also, if the bank, relying on the representation of the treasurer that the county needed the money and would replace it next day, extended credit only till that time, and canceled it next day in accordance with the understanding, there would be no liability,—it being immaterial in such case that the treasurer could not bind the county.  So long as the bank did not part with the title to its money it could withhold it, and the entry of the credit on such understanding created no greater right than grew out of the understanding.  (Pp. 130, 131.)

**7.  Same.**

See facts under which it was a question for the jury, dependent upon which of the three foregoing theories was accepted, as to the liabilities of the bank to the county (or to the treasurer's sureties by subrogation to the rights of the county) for a sum so placed by the bank to the credit of the treasurer for one day.  (Pp. 128-131.)

ERROR to the Court of Civil Appeals for the Third District, in an appeal from Travis County.

Walker, County Judge, brought suit against Anderson and others, sureties on the official bond of Jernigan as County Treasurer, and the latter made the Austin National Bank a party.  Being held liable to plaintiff and refused a recovery against the bank, defendants appealed, and on affirmance obtained a writ of error.

The statement and opinion of the Court of Civil Appeals, by KEY, J., disposed of the assignments relating to issues between plaintiff and defendants as follows:

"The defendants interposed a general demurrer and special exceptions to the plaintiffs' petition, because it failed to show how much of the general county funds and how much of the school funds Jernigan had received and disbursed, and what proportion of the defalcation was school funds and what proportion general county funds.  These exceptions were overruled.   *   *   *

"The first, second, third, and fourth assignments of error relate to the action of the court in overruling appellants' special exceptions to the plaintiffs' petition.

"As the defendants are obligors on both bonds, and as the first bond is so broad in its terms as to cover a defalcation as to school funds, as well as any others, and as the amount sued for is less than either bond, we are not prepared to say that the exceptions should not have been overruled.  The averments of the petition certainly showed a liability against the sureties; and, as to the first bond, this liability was absolute and unconditional for the entire sum.  As to the second bond, it existed only in so far as there was defalcation in the school funds; but as the obligors are the same on each bond, and the first is for an amount in excess of the defalcation, it is immaterial whether a cause of action was alleged upon the second bond.

"Besides, according to the undisputed testimony, there was no defalcation of any money shown to belong to the school fund; and the verdict

and judgment do not, in terms, fix liability on the second bond. Nor is it claimed that the appellants were misled or surprised by the plaintiffs' pleading, or by any evidence offered thereunder. It is reasonably certain that they were as well prepared with their defense as they would have been had the petition been as specific in regard to the defalcation as was the plaintiffs' evidence; and, such being the situation, even if error was committed in the ruling referred to, it appears to us that it should now be deemed harmless, and afford no ground for reversal of a judgment otherwise correct."

*Ward & James, Rector & Rector,* and *J. R. Hamilton,* for plaintiffs in error.—Where a plaintiff seeks a recovery on two different causes of action, evidenced by two separate bonds, given for the security of two distinct funds, facts must be alleged in the petition which show a liability upon the separate causes of action with sufficient certainty to apprise the defendants of the exact amount of the liability claimed against them under each bond. Britton v. City of Fort Worth, 78 Texas, 228; Jernigan v. Finley, 90 Texas, 206.

A bank which makes a loan to a county treasurer, immediately placing the amount of the loan to his credit as county treasurer, and certifying under the hand of its president that said amount was placed to his credit as a part of the funds of the county, has no right after having given such certificate to a committee authorized to investigate the accounts of the treasurer, to accept a check upon this fund and apply a portion of it to the satisfaction of the loan made to the treasurer.

A bank which furnishes to a county treasurer a statement of the balance due him from the bank as such treasurer, including an amount which he has borrowed from the bank, giving his note for the same, in reliance upon which the committee appointed by the district court to investigate the accounts of said treasurer is induced to report that said treasurer's accounts are in good order and that he has on hand all the funds of the county of which he is treasurer, and in reliance on which the commissioner's court of his county is induced to permit him to qualify as his own successor and to be inducted into office again, and by reason of which both the county and his bondsmen are prevented from prosecuting him criminally and from instituting any proceedings against him, is estopped to subsequently deny that such money was county money or to claim the right to appropriate a portion of said trust fund certified to by its president to the payment of the loan made to the treasurer. Custer County v. Walker, 74 N. W. Rep., 1040; Bank v. Bank, 50 N. Y., 576; Bank v. Keene, 53 Me., 103; Davis v. Dyer, 56 N. H., 145; Bank v. Morgan, 117 U. S., 115; Rev. Stats., 870, 871, 872, 920, 921, 922, 923, 3575, 3576, 3577, 3531, 3534; Const., art. 5, sec. 24; art. 3, sec. 20.

Where a county treasurer becoming financially embarrassed procures a loan from a bank in order to make good his shortage to his county, and in order that his accounts may pass the scrutiny of the investigating committee appointed in accordance with the law by the district

court to examine his accounts and report to the grand jury, and the proceeds of said loan are placed to his credit with the bank, as county treasurer, and the bank certifies that such proceeds are the funds of his county, then the amount of such loan so placed to his credit becomes a part of the funds of his county, and his subsequent check upon these funds to pay the amount of his loan to said bank is a misappropriation of the county's funds in which the bank participates, and for which it is liable to the county, and to the bondsmen of the treasurer. Longmire v. Fain, 18 S. W. Rep., 70; Packing Co. v. Bank, 11 So. Rep., 28; Bayard v. Bank, 52 Pa., 232; Garrard v. Railway, 29 Pa., 154; Bank v. Philip & Wiggs, 30 S. W. Rep., 217; Newman on Bank Deposits, sec. 107; Bank v. Insurance Co., 104 U. S., 693; Custer County v. Walker, 74 N. W. Rep., 1041; State v. McFetridge, 54 N. W. Rep., 998; Baker v. Bank, 100 N. Y., 31.

Where the bondsmen of a county treasurer are sued upon his official bonds for the shortage in his accounts, and it can be shown that a third party has misappropriated the amount of funds sued for by the county, and is under the law liable to the county for the amount of shortage, the said bondsmen are subrogated to the rights of the county, and are entitled to have the party who is liable for the shortage made a party defendant in the suit against them for the breach of the bonds, and they are entitled to have judgment over against such party who is under the law liable for the shortage sued for. Tayler County v. Standley, 79 Iowa, 670; Chaffee v. United States, 18 Wall., 538; Throop on Pub. Off., sec. 203; Mech. on Pub. Off., sec. 922; Dilly on Parties, 455; Rev. Stats., art. 1208; 58 Am. Rep., 590; Garrett v. Gaines, 6 Texas, 447; Denison v. League, 16 Texas, 409; Williams v. Wright, 20 Texas, 503; Iglehart v. Moore, 21 Texas, 504; Estell v. Cole, 52 Texas, 177; 17 Am. and Eng. Enc. of Law, 598, 599, and notes.

*Walton & Hill* and *West & Cochran,* for appellee the Austin National Bank.—As Jernigan was in law held for the proper application of all county moneys coming to his hands and could not plead as a defense the loss of the same in any way, his relation to the county was not that of a bailee for hire, and there was no law requiring that he should keep the money in the county safe, and he was at liberty to choose such place of deposit as to him might seem best. Wall v. McConnell, 65 Texas, 397; Wilson v. Wichita County, 67 Texas, 647; McKinney v. Robinson, 84 Texas, 489; Perley v. County of Muskegon, 32 Mich., 132.

When Jernigan deposited county moneys in the Austin National Bank, the limit of the county's right, so far as the bank was concerned, was to trace its own moneys into the account, and so far as it could trace the same it would be entitled to recover from the bank such part as it could identify. Bank v. Weems, 69 Texas, 489; 2 Perry on Trusts, sec. 828.

The relation between Jernigan and the bank was such that it was the duty of the bank to pay his checks in the ordinary course of dealing as presented. Bank v. Insurance Co., 104 U. S., 54.

If the deposit account kept by Jernigan with the bank and the balance to his credit of $12,000 on December 9th was properly money of the county, his act in negotiating the loan with the bank on that day shows clearly and ·distinctly the fact that this additional $10,000 was his own money and not trust funds, and if the note be treated as his personal note the facts show that by the terms of the contract under which he obtained the credit it should be applied on the same and certainly by the following day to the discharge of his obligation, and therefore the county could not, nor can the defendant bondsmen, claim a benefit under that contract and deny the liability and obligation to return the money. The whole transaction must stand or fall, and appellants can not separate and claim what is good to them and deny what is hurtful, since the whole matter was the arrangement of their principal, and the facts show that at the time the loan was made Jernigan was a defaulter to the county, and was personally insolvent, and therefore there existed at that time an unquestioned liability against them to make good this deficit to the county.

The facts show that Jernigan, in negotiating for the loan, assumed to act in his official capacity and gave his demand note to the bank as county treasurer, and under these circumstances, if the loan had been actually used by the county and withdrawn from the bank, it could follow the money and recover the same from the county. City of Waxahachie v. Brown, 67 Texas, 519; City of Louisiana v. Wood, 102 U. S., 294; Argenti v. San Francisco, 16 Cal., 256; Allen v. LaFayette, 89 Ala., 641; Dill. Mun. Corp., sec. 938; Turner v. Cruzen, 70 Iowa, 202.

Since the credit of the $10,000 was made to Jernigan upon his account as treasurer, and was based entirely upon his note as such, we contend that if the note is to be treated as void, the credit should also be treated as of no effect as being given without consideration, and therefore the transaction being executory and unauthorized by law, the bank had it within its power to rescind and recede from the arrangement, and therefore that by so doing Jernigan would have been powerless had he desired to compel the bank to give up the $10,000 based upon the void note. City of Waxahachie v. Brown, 67 Texas, 519; 27 Am. and Eng. Enc. of Law, 361.

We submit that the uncontradicted evidence shows that Jernigan perpetrated a fraud upon the bank in concealing from its officers the fact that he was a defaulter and in representing and inducing the bank to believe that he had expected to have the money in, prior to December 9th, and certainly expected to have it by the following day, when in truth and in fact he had no such expectations, and in further concealing from the bank the fact that a committee had been appointed to examine his accounts. This fraud we submit was sufficient in law to vitiate and render null and void the entire transaction by which he obtained the credit, and therefore that the defendant bondsmen can not claim any benefit of said transaction and stand in no better right in relation thereto

than did Jernigan. 8 Am. and Eng. Enc. of Law, 825 to 829, and cases cited; 2 Pom. Eq. Jur., sec. 906.

The uncontradicted evidence shows that Jernigan was a defaulter to the county when he applied to the Austin National Bank and made the arrangement for the credit of $10,000, and the evidence wholly fails to establish any facts tending in any degree to show that the bank officers were cognizant of such defalcation, and therefore, instead of the principles of estoppel being applicable against the bank they afforded to the bank a weapon of offense, and would have entitled it as soon as the true state of affairs became known to rescind the credit and insist that the same was void.

The evidence wholly fails to establish such facts as would support the plea of estoppel against the bank under any circumstances, and particularly because it was affirmatively and unquestionably proven that Jernigan was personally insolvent and could not be made to respond for his defalcation at any time after December 9, 1896, and therefore neither the county nor his bondsmen were prejudiced in any manner by the statement given by appellee's president to the finance committee appointed by the District Court. Scoby v. Sweatt, 28 Texas, 731.

This being a suit against a banking corporation, we submit that its president and cashier were trustees of its funds for the benefit of its stockholders, and that if it be held that the note given by Jernigan was an absolutely void transaction, then that no title or right passed out of the bank to its moneys which had never been removed from its vaults, and that therefore, under the principles of equity, the rights of the bank as a corporation are to be regarded as superior to any claim which can be asserted by the defendant bondsmen against it.

The old rule as to "scintilla of evidence" can hardly, at this day, be said to be a "reasonable, practical, correct," or just rule. Its narrowness has been largely abandoned, and a new and better one substituted, which is about, if not exactly as follows: "Formerly it was held that if there was what is called a 'scintilla' of evidence in support of a case, the judge was bound to leave it to the jury, but recent decisions of high authority have established a more reasonable rule, and that is, 'that in every case, before the evidence is left to the jury, there is a preliminary question for the judge—not whether there is literally no evidence, but whether there is any upon which a jury can properly proceed to find a verdict for the party producing it, upon whom the onus of proof is imposed.'" Improvement Co. v. Munson, 14 Wall. (U. S..), 448.

If we may rely on citations in American and English Encyclopedia of Pleading and Practice, volume 6, pages 678, 679, a like rule as that above quoted has been adopted in Alabama, Arkansas, California, Colorado, North Dakota, Georgia, Illinois, Indiana, Iowa, Kansas, Maryland, Massachusetts, Michigan, Mississippi, Missouri, Nebraska, New York, North Carolina, Pennsylvania, South Dakota, Wisconsin, and in the courts of the United States.

WILLIAMS, ASSOCIATE JUSTICE.—Plaintiff's in error were sureties upon the official bond of A. J. Jernigan, former treasurer of Travis County, and, after his death, which occurred on the 31st day of December, 1896, they were sued by the county judge, in behalf of the county, to recover a sum of money for which he had failed to account. The sureties, besides defensive pleadings, filed a petition making E. P. Wilmot and the Austin National Bank parties to the action, asserting liability on their part to the county for the money sued for, and a right of such sureties to subrogation to the right of the county against Wilmot and the bank, in case the county recovered on the bond. Enough of the facts averred in this plea will appear in the course of the opinion to make the views expressed intelligible.

The facts entitling the county to recover against the sureties were practically uncontroverted in the District Court, and verdict and judgment in its favor were accordingly rendered. The action of the sureties having been discontinued as against Wilmot, the trial court instructed the jury return a verdict against their claim to recover over against the bank, which was done. Upon appeal by them, the Court of Civil Appeals affirmed the judgment, and the present writ of error was granted by this court because of probable error in the peremptory instruction of the trial court in favor of the bank.

Some objections were urged in the Court of Civil Appeals and are presented here to rulings of the District Court upon questions arising between the county and the sureties. No reversible error has been found in such rulings and the judgment in favor of the county, against the sureties, will therefore be affirmed.

The other grounds of error relate to the rulings of the trial court upon questions arising in the cross-action of the sureties against the bank. The first of these rulings was the sustaining of a general demurrer to a plea of the sureties asserting that the bank was estopped in favor of the county to deny that it held in its possession $10,000 of the county's funds, deposited with the bank by Jernigan, as treasurer, and that the sureties were entitled to be substituted to the right of the county growing out of such estoppel and to require the bank to account for such funds for their protection.

The facts upon which the claim of estoppel was based, as they were alleged, are, in substance, these: Jernigan was treasurer of the county for several years prior to the election of 1896 and kept his funds on deposit with defendant bank, his account being a large and valuable one and the bank paying him interest on deposits. At that election, he was again chosen to the office, but had not qualified on the 9th day of December, 1896, when the District Court of the county appointed a finance committee to examine his accounts. The committee demanded of Jernigan to know the amount of cash on hand belonging to the county, when he replied that he had on deposit with the defendant bank $22,000, and gave to them a letter, signed by him as treasurer, addressed to the bank, requesting it to state to them the amount to his credit. The com-

mittee applied to the bank with the letter, and its president, Wilmot, stated to them that Jernigan then had in the bank, belonging to the county, the sum of $22,000, showed them the books verifying such statement, and gave them a written representation to the same effect, which was done with intent that the fact represented should be acted on and accepted by the committee as showing the amount belonging to the county in the bank. The committee, believing the statement to be true, reported to the court that the treasurer's accounts were correct and all money on hand, as it should be. This report was, by the court, ordered to be filed, and was presented to the grand jury and approved by them in their report to the court. Had there been in the bank, belonging to the county, the sum thus reported there would have been no shortage; but, by the pleadings of both the county and the bank, it appeared that there was on hand in the bank only the sum of $12,000, the difference being a little more than the amount of Jernigan's alleged defalcation. The plea of estoppel further averred that, if there was in fact only $12,000 in the bank belonging to the county, then the bank, with knowledge that Jernigan was a defaulter, conspired with him to make it appear that he had on deposit $22,000, for the purpose of deceiving the committee, the court, and the grand jury, and of preventing the committee from making a true report and the grand jury from indicting Jernigan, and of keeping him in office and thus retaining the account which he kept with the bank; and, for this purpose, made the statements alleged; that by reason thereof, Jernigan was not indicted, removed, or suspended; "that this conduct of the bank prevented and hindered the committee from a proper discharge of its official duty, impeded and thwarted the enforcement of the law' as to county finances, denied and prevented Travis County the right to ascertain the condition of the account of her said treasurer by and through an investigating committee;" that Jernigan did not qualify as his own successor until December 24, 1896, when he was, by reason of his defalcation, ineligible to office, and that the conduct of the bank enabled him to qualify and hold the office in violation of law and to the injury and scandal of the county.

1. It is doubtless true that conduct of the bank is here alleged such as would be sufficient to estop it from denying the truth of its representation, in favor of anyone entitled to rely upon its truth who has been induced, by reliance upon it, to so act or refrain from acting as to place himself in a situation to suffer loss or damage, if the bank were now allowed to show that the statement was false. But, whatever of moral wrong or fraudulent purpose the conduct may have involved, only one who will suffer legal injury if its falsity be now established can assert an estoppel against proof of the truth. The general principles governing the subject are so well settled and have been so often stated by this court that there is no need to repeat them here. All that is necessary is to ascertain whether or not it is shown by the plea that the county is in a position to demand that the bank be held to the statement as if it had been true, notwithstanding its offer to show that it was false.

There is no pretense that any estoppel arose in favor of the sureties, their contention being that it existed in favor of the county and that the resulting right inures to their benefit by subrogation. Whether or not this last position be sound, even if there were an estoppel in favor of the county, is a question we need not consider, since we are of the opinion that no estoppel is shown by the plea. Nor need we stop to inquire whether or not a statement made to a finance committee, appointed under our statute, is one upon which the authorities representing the county and empowered to take action for the recovery of money belonging to it have the right to rely, in such a sense that action or nonaction on their part on the faith of such statement might estop the party making it. For the plea fails to show that such authorities (the commissioners and county judge) ever heard of the statement made by the bank or that they were in any way influenced to take or omit any action by reason of it. Concede that the committee and the grand jury were deceived. Neither of those bodies could have instituted any proceeding to secure or recover the money due from Jernigan. Neither their action nor nonaction could, in the least, hinder or deter the proper authorities from taking any proceeding deemed advisable; and the statement made to them did not, so far as the plea shows, mislead or otherwise influence those authorities.

A further defect in the plea is the failure to show that the county has sustained the loss of its money or has failed to recover any part of it, in consequence of the representation. Not even a probability of loss, as the effect of it, is shown. The money had been appropriated by Jernigan and was lost to the county before the statement was made, and such appropriation was in no measure attributable to the statement. Had it been within the power of the county officials to recover the money or a part of it by proper action, and had they been prevented by the bank's conduct from taking such course as would have led to a recovery, it may be true, as urged, that this would supply the element of estoppel under consideration. But nothing of the kind is alleged. It is asserted that the committee, the District Court, and the grand jury were deceived, and, as a consequence, the last named body omitted to indict Jernigan and he was thereby allowed to continue in office when he would otherwise have been suspended, and to qualify again when he would have been prevented from so doing; but none of these things conduced to the loss of the money, and it is not made to appear how a contrary condition would or might probably have led to its recovery. No additional loss was inflicted on the county by the failure to indict and suspend and by the installment in office anew. The most that can be said is that it may be conjectured that, had the bank, instead of misrepresenting the facts, disclosed the true condition, the officers representing the county would have been advised of the necessity of action and might have so exerted themselves as to secure some redress; but this is only a conjecture which the plea leaves the court to make. This can not be held sufficient by the most liberal rules of estoppel. All this is said upon the assump-

tion that the county authorities did not already know the condition of Jernigan's account, which is probably a fair inference, though the plea does not directly so allege.

Because of its failure to show any reliance by the county officers upon the representation and any change in the attitude of the county towards Jernigan on the faith of it, the plea was fatally defective. And herein the case is distinguishable from those of Custer County v. Walker, 74 Northwestern Reporter, 1040, and Longmire v. Fain, 18 Southwestern Reporter, 70, in each of which the representations of the parties held to be estopped were used by the officer in making his official report to those whose duty it was to represent the public in passing upon his accounts, and were accepted· by them as true. While those cases were probably decided correctly on the facts, the reasoning, by which both an estoppel and a liability in the nature of a contractual one on the part of those making the representations are applied, is not very satisfactory. See also East Hartford v. American Nat. Bank, 49 Conn., 539.

In this case the finance committee had no power to act upon any report made by Jernigan so as to alter or affect in any way the rights of Jernigan or of the county in the funds in his hands. They were empowered simply to ascertain facts for the information of the grand jury, and the rights of parties were not subject to any action they might take. Consequently, their acceptance of the statement of the bank could not, by its own force, bind anyone. The demurrer to the plea of estoppel was properly sustained.

2. By other pleadings, the sureties charged that the bank actually had in its hands $10,000 belonging to the county and had unlawfully appropriated that sum to the payment of an individual indebtedness of Jernigan to it. If this was true, the county could have recovered it from the bank and the sureties would be entitled, for their protection, to have such right enforced. It remains to inquire whether or not the evidence presented any issue of this character to be submitted to the jury.

It was shown that prior to the 9th day of December, 1896, Jernigan had misappropriated about $10,000 of the county's money which he had deposited with the bank as treasurer. This was done by means of checks properly drawn by him in his official capacity, and there is no claim that the bank was in any way implicated in his misuse of the public funds. But on that day, Jernigan executed to the bank a demand note for $10,000, signed by him as county treasurer, antedating it so as to cover the days of grace and make it mature at once, and procured the entry of a credit of a like sum upon his account as treasurer, thus showing, upon the books, his balance to be $22,000 when before there was a balance of only $12,000. At the same time he gave to the bank his check for $10.000, as treasurer, payable on the 10th day of December. On the next day the bank charged up the check, thus balancing the credit, and also canceled the note. All of the facts before stated, as alleged in the plea of estoppel, are also shown by uncontradicted evidence, ex-

cept the alleged purpose of the bank and its knowledge of Jernigan's defalcation, which were the subject of controversy.

Concerning these transactions, the cashier and president of the bank testified. The cashier stated "that a note passed through his bank as this $10,000 note had the same effect as if that much cash had been actually deposited by the maker, and that after this $10,000 note was discounted, A. J. Jernigan had $22,000 on the books of the bank as treasurer, and his check would have been honored for that amount on December 9, 1896." The evidence of the president on this point is to the same effect. When the finance committee applied for information and the reply as to Jernigan's balance before shown was given, neither officer informed them of the circumstances of their transaction with Jernigan. Both of them testify that they had no suspicion of Jernigan's defalcation; and, in explanation, the president testified that Jernigan came to him and stated, "We need $10,000 more to-day than what we have on deposit. We should have the money in, and I have assurances that we will have it to-morrow, and I would like to make a demand note for $10,000;" that, as Jernigan had kept a good account, and having no suspicion of his honesty, the witness had extended the accommodation, the check taken to be charged up next day, assurance being given by Jernigan that the money would be in by that time, and witness having no knowledge of the appointment of the finance commmittee; that he believed the note signed by Jernigan as treasurer was a legal and valid obligation against the county, since it was placed to the county's credit, and thought the money was for the county's benefit, and otherwise would not have entertained Jernigan's proposition. He testified at great length as to circumstances affecting the good or bad faith of his action, but the statement given will sufficiently show the nature of the issues upon which the case depended.

The question which must be determined is whether or not there was any evidence tending to establish a state of facts under which the jury could have found that the $10,000 became the money of the county and that it had been misapplied by the bank. If this be answered in the affirmative, it follows that the peremptory instruction in favor of the bank was erroneous.

There being no estoppel, the rights of the county and of the bank must depend upon the true nature and effect of what was done, irrespective of the statement to the finance committee, which statement may be, however, considered in determining the true question. Since the county, before this transaction, did not own the money in question, it must have acquired it through the act of the bank and with its consent. If it did once acquire unconditional title, it can not be defeated by the application of the fund to the note. Jernigan could not bind the county by the note and it was therefore simply his individual debt. The fact that the deposit was kept in his name as treasurer was sufficient to notify the bank that money so held was a trust fund which could not be

diverted to the payment of Jernigan's debt. The bank was also chargeable by law with knowledge of the legal effect of the note and that it imposed no liability on the county. The note, the check, and the entry of the credit upon the books were all parts of the transaction, however, and must all be considered together in ascertaining the rights which sprang from them; and if any right in the county resulted, it must be such as the consent of the bank conferred upon it. It is an undisputed fact that a credit to the county was entered upon the bank books, and this, prima facie, represented so much money on deposit belonging to the county. It is true that this was only evidence of the fact and that it was open to explanation. Newmark on Bank Deposits, sec. 131. The entry did not control the understanding under which it was made and conferred no greater right than the parties to the transaction intended by it. Evidence was admissible to show the whole of the transaction and the purposes of the parties are to be deduced from the whole of such evidence. Morse on Banks and Banking, 290, et seq.

After a very careful consideration of the case, we have concluded that the jury should have been allowed, under proper instructions, to determine the effect of all the evidence for themselves, and that the case is not one in which the transaction has necessarily a precise legal effect, which the court can declare as matter of law.

Several questions of fact present themselves under the evidence upon the answer to which the rights of the parties depend.

First. Thus, if the only purpose of Jernigan and the officers of the bank was to fabricate evidence by which to conceal from the committee and the grand jury the former's defalcation, with no intent that any real right in the county should result, then, as it required the consent of the bank to confer a right upon the county, and as it is not estopped to prove the truth, there would be no basis upon which it could be held liable.

Second. Or, should the jury accept as true the statement of the president that the bank relied upon Jernigan's representation that the county needed the money and would replace it next day, and agreed only to extend a credit until that time, and for that purpose made the entry on the books and canceled the credit next day in accordance with this understanding, there would be no liability. In this view of the case, it is of no moment that Jernigan could not bind the county. The reason for the proposition stated is that, so long as the bank did not part with the title to its money, it could withhold it, and the entry of the credit on this understanding would not, as we have before said, create any greater right than grew out of such understanding. Nor, for the same reason, would the taking of Jernigan's note and check as county treasurer and the cancellation of them affect the right here defined. The right to withhold the money would not result from such instruments, for they did not bind the county, but from the fact that the title never passed to the county.

Third. But if the money was loaned to Jernigan for the purpose of

making a real deposit of it to the credit of the county to make good his defalcation, and the note and check were taken simply to enable the bank to apply the money so deposited to Jernigan's individual debt, which the note in legal effect was, the title of the county would have attached by such deposit and such an application of it would be·unauthorized.

Jernigan had the right to borrow money on his own credit, and to deposit it to the credit of the county. If this was the effect of what was done, when tested by the intent and purpose of the parties, the right of the county to the deposit became complete and could not be taken away, as was attempted.

It may be thought that the evidence does not point to the existence of either of the states of fact supposed in the first and third paragraphs, and it is true that the express testimony of the president defines the transaction as being of the character mentioned in the second. But we think the circumstances surrounding the case, upon which we make no further comment, made it proper to submit all of them to the jury.

For the error of the trial court in directing a verdict in favor of the bank, the judgment in its favor will be reversed and the branch of the case involving the controversy between it and plaintiffs in error will be remanded.

> *Affirmed in part and reversed and remanded in part.*