FIRST NAT. BANK OF CANADIAN v.
JONES et al. (No. 1478.)

(Court of Civil Appeals of Texas. Amarillo.
Feb. 12, 1919. Rehearing Denied
March 12, 1919.)

1. APPEAL AND ERROR ⊚⇒500(1) — MATTERS
REVIEWABLE—EXCEPTIONS.

Assignments of error based upon alleged action of court in overruling certain exceptions cannot be considered, where transcript contains no order showing that court ever considered or ruled upon exceptions.

2. ESTOPPEL ⊚⇒118—PERMITTING MORTGAGE
OF CATTLE—EVIDENCE.

In action to foreclose mortgage on cattle, evidence *held* to sustain finding that a third person to whom cattle belonged had done nothing which would lead an ordinarily prudent person to believe that they belonged to mortgagor, and that mortgagor had a right to mortgage them.

3. BAILMENT ⊚⇒21 — APPARENT TITLE OF
BAILEE.

Mere possession by bailee of property is not sufficient to create any right in favor of third person who takes mortgage upon them.

Appeal from District Court, Hemphill County; W. R. Ewing, Judge.

Action by the First National Bank of Canadian against J. T. Jones and others. From a judgment for defendants, plaintiff appealed. Affirmed.

H. E. Hoover and Newton P. Willis, both of Canadian, for appellant.
Frank Willis, of Canadian, and Clinton C. Small, of Wellington, for appellees.

HALE, J. Appellant bank sued appellee Jones to recover upon a promissory note, for the sum of $7,866, and to foreclose a chattel mortgage upon certain cattle therein described, executed by the said Jones to secure payment of the note. By amended original petition he made H. D. Creath, T. J. Kelly, and J. K. Lunn parties defendant, upon the ground that they were claiming some interest in the mortgaged property. By agreement, Lunn was dismissed from the suit, and is not a party to this appeal. Appellee Creath answered, alleging in substance that he held a prior mortgage upon the cattle in question to secure a note in the sum of $14,450, dated April 16, 1917, which had been renewed July 18, 1917; that said debt was not paid; that his mortgage was recorded in Wheeler county at the time of the execution of the mortgage; that he learned for the first time that the cattle had been removed from Wheeler county, since the institution of the suit or a few days prior thereto. He prayed for judgment and a foreclosure of his mortgage. Appellee Kelly answered, alleging in substance that he was the owner of all the cattle described in the plaintiff's petition, except 40 cows and their increase, branded with a cross on the right hip; that he executed the mortgage declared upon by Creath. He prayed for judgment decreeing him the title and possession of the cattle, subject to Creath's lien.

By first supplemental petition plaintiff replied to the answers of the defendants Creath and Kelly, first by general denial, and specially alleging that Creath's mortgage did not cover the cattle in question; that they were not described in said mortgage; that appellant's mortgage was taken in good faith, without any knowledge that the defendants had any claim whatever upon the cattle; that defendant Jones had been in possession of said cattle for a long time, holding them in Hemphill and Lipscomb counties, using them as his own, shipping some of them to market and having the proceeds of the sale thereof remitted to him in his own name, all of which was done with the actual knowledge of his codefendant Kelly; that there was no circumstance to put it upon inquiry as to the claim of said defendants; that the defendants permitted the said Jones to handle the cattle as his own, clear of all liens, which fact misled plaintiff to its damage, and but for which it would not have loaned it money and taken said cattle as security; that the cattle were located in Hemphill county early in the spring of 1917, and had been in said county over four months, without any mortgage of record against them, or any indication of ownership in any other person than Jones; that if the defendant ever had any mortgage upon said cattle, it was recorded only in Wheeler county; that after the institution of the suit, and after defendant Jones had fled the country, defendant Kelly came to Lipscomb county, where the cattle were then located, and converted 86 cows and 40 calves, covered by plaintiff's mortgage of the value of $5,500; that the defendant Kelly knowingly permitted said cattle to remain in the possession of Jones and without Creath's mortgage being filed in either Hemphill or Lipscomb counties, within four months after the removal of same from Wheeler county, which acts constituted fraud and misled plaintiff to its damage. The prayer was for judgment against Kelly for the value of the cattle converted by him, and that in the event the defendant Creath recovered said cattle, or any part of same, that it have judgment over and against defendant Kelly for such amount. Creath and Kelly filed their supplemental answer, alleging in substance that plaintiff's mortgage covered 224 cows, branded J on the left hip, clear of incumbrance, except $8,000 to T. J. Kelly, and that plaintiff had actual notice of a prior lien upon said cows, which

⊚⇒For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

lien is the lien owned by the defendant Creath. There was a trial before the jury, to whom the case was submitted upon special issues; the issues and answers thereto being as follows:

"(1) Were the cattle branded + on the right hip, taken by C. B. Haynie, the receiver in this case, the property of J. K. Lunn? Answer: Yes.

"(2) At the time J. T. Jones executed the mortgage dated October 25, 1917, to the First National Bank, did he own the 224 cows described in said mortgage as branded J on left hip? Answer: No.

"(3) If you answer the foregoing question in the negative, then state who owns said cattle. Answer: T. J. Kelly.

"(4) If you have stated that T. J. Kelly owned said cattle, then were the acts and conduct of the said T. J. Kelly with reference to said cattle such as to lead an ordinarily prudent person to believe that the said cattle belonged to J. T. Jones, or that he had the right to mortgage them? Answer: No.

"(5) Are the cattle involved in this suit branded J on left hip part of the same cattle described in the mortgage from Kelly to Creath, dated April 16, 1917? Answer: Yes.

"(6) Did the defendant Kelly own the cows and calves taken by him from the Jones place in Lipscomb county to his place in Wheeler county, at the time he took them in November, 1917? Answer: Yes.

"(7) At and before the time J. T. Jones gave the mortgage in controversy to the First National Bank, did the defendant Kelly know that the defendant Jones was handling the cattle in controversy, exercising complete control over the same? Answer: No.

"(8) Did T. J. Kelly so conduct himself as to reasonably induce the officials of the First National Bank to believe that J. T. Jones was the real owner of the cattle involved herein? Answer: No.

"(9) Did T. J. Kelly know that Jones had mortgaged the cattle involved in this suit to the First National Bank of Canadian, Tex., prior to the time Jones abandoned the cattle? Answer: No.

"(10) Were the cattle claimed by the First National Bank under their mortgage against Creath and Kelly the property of T. J. Kelly, on October 25, 1917? Answer: Yes."

Several other issues were submitted, which we think are immaterial under the view we take of the case.

[1] The first three assignments in appellant's brief are based upon the alleged action of the court in overruling certain exceptions; but, since the transcript contains no order showing that the court ever considered or ruled upon the exceptions, these assignments must be disregarded. We will not undertake to consider the assignments in detail, or in the order presented. Appellant attacks the claim of ownership asserted by Kelly and the validity of Creath's mortgage, asserting that it is void as to appellant because the cattle are defectively described, and because of the failure of Creath to file the mortgage in Hemphill county within the statutory period. If it be true that Kelly is the owner of the cattle, and by his acts or failure to assert his claim at the proper time he is not estopped from claiming the cattle as against appellant, it will not be necessary to consider the question of the sufficiency of the mortgage and its registration. As shown, the jury found that the cattle covered by appellant's mortgage were the property of Kelly on October 25, 1917, when they were mortgaged to appellant by Jones, and that Kelly was not chargeable with any acts or conduct with reference to the cattle which would lead an ordinarily prudent person to believe that they belonged to Jones, or that he had a right to mortgage them. The jury further found that Kelly did not know that Jones had mortgaged the cattle to appellant prior to the time Jones abandoned the cattle and fled the country. The testimony bearing upon this issue comes mainly from appellee J. J. Kelly and is in substance this:

"I made arrangements with Jones for him to take care of this bunch of cattle. He agreed to do this before I traded for the cattle—take care of them for me through the summer. He was to keep them somewhere over about Kelton, southeast of Wheeler. I rented some grass out there. I rented some more grass around the Kelton neighborhood. He only had a little grass there at his home section and a half section leased, and I had a section and a half at my home place that I thought we could use until the winter was over. The cattle stayed on the place we moved them to from Collingsworth county something like 30 or 40 days. We put them over on the Gageby then. We did not keep them a great while over there. Then we moved them across the river in the next county—Lipscomb county. They were summered on Gageby and in Lipscomb county. I was living on Sweetwater at that time, about 7 miles west of Wheeler. It was about 60 miles to where we kept them in Lipscomb county. I made several trips up to Lipscomb county; two or three trips I think, maybe four, to see the cattle. I owned the cattle myself. I did not sell any part of them to Jones. I didn't consent for Jones to mortgage them to the First National Bank of Canadian, or to any one else. I owned them on the 25th day of October, 1917, and the cattle that were mortgaged to the First National Bank of Canadian were mine. I did not know anything about Jones mortgaging them at that time. The first time I learned that Jones had mortgaged them to the bank was between the 6th and 8th of November. I did not know anything about the mortgage until Jones had left the country. He was gone when I came up here and heard it. I drove these cattle down on Sweetwater. They are the same cattle I got from Scott; that is the same lot of cattle. I don't know what went with the balance of them. The cows had the J brand on left hip and were branded "Lazy S" on the right hip. Some of the calves were branded with a tally bar. They were branded in Wheeler county after they left Collingsworth county. I guess they were branded under my instructions. I told them to brand them whatever they could to hold them. I told them to put that bar brand on the young stuff;

that I had a lot in the same brand at home. They were just holding brands. As to how long I intended to keep them in Lipscomb county, I calculated to ship them out but there was not grass enough to fatten them. I didn't ship any of them out. It was too dry and not enough grass. The J brand was not on the cattle at the time I executed the mortgage to Creath; that brand was' put on in Wheeler county at the stock pens at Shamrock, en route from Collingsworth county to Wheeler county. I am not certain they were branded in Shamrock.' When I was up here (Hemphill county) in the fall of 1917, I heard that Jones had mortgaged some of them to the bank here at Canadian, and I went to the bank and investigated this matter with the officials of the bank. I talked with Mr. Isaacs one of the officers of the bank. I discussed the proposition with him. There was nothing said about the brand on the cattle that he had taken a mortgage on. I asked him about the brands that were on them, and he looked for the papers and said that the papers were somewhere else. I then went out to where the cattle were, saw Jones, and he told me he put in about 50 head of stuff. I then went back and saw Isaacs, and told him I found things better than I expected to. Jones had some other cattle up there. He told me at that time he had bought some other cattle. * * * I didn't know he [Jones] had put it [the J brand] on them. Yes; J stands for Jones or Jeff; J doesn't stand for Kelly. As to my permitting him to put a brand on the cattle that indicated his ownership, I didn't tell him what to put on them. It was put on; yes, sir; and is on there yet. I had agreed that these cattle should be branded with a slash later on. I expected to put a slash on them. I was over here·at the courthouse about 40 minutes before the lawsuit was over that Jones had with Aires, suing him for damages to these particular cattle. I would not say that I heard part of the evidence in the case. I was not here at the time the evidence was being given, and at the time Jones was claiming that these cattle were his. I came up in the afternoon. I think the evidence was all in when I came to the courtroom. I didn't know that Jones had sued Aires for damages to the cattle until that day. I don't know when that was; I guess it was about a year ago now. I didn't know he had sued him for damages in this suit. I told him not to monkey with that (Aires) section of land; we had tried that section of land once before. Yes; I know he had brought suit to recover damages. When I was here in the courtroom, knowing that a suit for damages alleged to have been sustained to my cattle, I didn't make any inquiry with regard to the damage to the cattle. I don't know whether I told anybody in this county that these cattle belonged to me or not. If I did, I had no occasion to. * * * I could not tell you the date that I had the conversation with Isaacs. It was awhile before Jones ran away. I went up to Lipscomb county several times, and went up there on that occasion, and I looked through the cattle at that time, and I didn't come back and tell Mr. Isaacs that it was all right; that I thought Jones had the number of steers that he had mortgaged to Isaacs. I told Isaacs that evening that things were in better shape than I expected. Isaacs told me that Jones had mortgaged him 100 head of yearling steers. As to

my stating in that first conversation with Isaacs that I didn't think he had the steers, I knew that he didn't have them. The bunch that I had were heifers and steers. If he had that many steers, it was just likely I'told Mr. Isaacs he had bought them, if he had that many. I went up there and looked through the cattle, and came back and told Mr. Isaacs that it was better than I had expected; that he had turned in more cattle and put in other cattle belonging to a man right across the·fence; some of these were cows, and there were some steers and 'one year olds past.' I could not say how many. They were scattered through the cattle, and there were a number of strays and cross cattle. I do not know how many. 'Jones claimed there were 50 head; most of them cows. I don't know how many yearlings I saw there at that time;. I didn't tally them out. * * * Could not tell how many cattle were in there; there were a lot of strays. Could not tell whether they were Jones' or not; I knew they were not mine. I saw some of my own cattle there; don't know how many, but enough to take it for granted that the bunch was there. I didn't tally them and don't suppose I saw them all. It was a rough country. I rode around amongst the majority of them; that must have been up in August, and not in June. I don't think it was that early. It could have been; I know it was in the summer. As to whether or not it is a fact that in a conversation with Isaacs in the Canadian State Bank, in which conversation he told me that he had gotten a mortgage from Jones on these cattle and upon these yearlings, and whether or not I told Isaacs I didn't think Jones had that many yearlings, I probably did. That was about the number that was in that bunch. I don't think I told Mr. Isaacs in that conversation that the greater number of the cattle belonged to me, and that I had known Jones for quite a while; that I wanted to render Jones some assistance. According to my knowledge, I didn't tell him that. I didn't have any trade with Jones about the cattle; he was just to handle them for me—find grass for them. I mean by handling that he was to take care of them."

"Q. You never at any time said to any man in Hemphill county where you were passing through, and never told Mr. Isaacs when you were talking to him about having a mortgage on these steers, that you owned a lot of the Jones cattle did you? A. I think I gave him a hint; as to the kind of hint I gave him, I didn't feel like accusing him until I thought it was necessary. Yes; I went back and told Mr. Isaacs that it was all right. Now, I am getting up in a suit and attempting to take these identical cattle away from Mr. Isaacs. Yes, sir. Q. Do you admit that you had a hint that Jones was mortgaging and shipping the cattle? A. No, sir; no shipping about it. Yes; in other words, I had a hint, but I didn't want to expose a man unless it was necessary. Q. In other words, you admit that according to the statement now that you had reason to believe that Jones was handling these cattle in a way that put a suspicion in your mind as to his right to mortgage them? A. He claimed he was not mortgaging them. Q. In other words, you had enough to put you on inquiry, but you let Jones talk you out of it, and you went back and told Mr. Isaacs that it was all right; is that. a fact? A. I

didn't tell him it was all right. Yes; I told him that Jones had the cattle. He had more cattle than I figured on him having. I don't know whether that eased up Mr. Isaacs or not. I could not give you the first time I went over there; it was probably in the early spring; no, it must have been up in the summer. I think I was over there three times. As to whether or not I went up there after I was here and heard of the lawsuit he had with Aires, I started up there that time and found Jones here. I didn't ask Jones to tell me what kind of a suit he had instituted on my cattle. No, sir; he told me what he had gotten into. He told me that he had sued Aires for damages to these cattle. I heard the case argued after it was all over. I was sitting out there in the courtroom during a part of the argument of the case, but I do not think I heard any of the evidence put on. I didn't hear Jones testify that these were his cattle, and that he brought them from Collingsworth county. I heard a part of the argument in the case. Do not remember whose argument I heard. I was interested enough to find out what it was all about, and made inquiry after it was all over about it. I found out from Jones, but didn't inquire of anybody else. I didn't have anything to do with the Aires pasture, or the Aires suit. I told him to let that section of land alone. * * * As to my having a suspicion at that time that Jones had mortgaged that bunch, I didn't know hardly what to think. I thought that Jones was perfectly honest, and I wanted to see about it. I did have an intimation that he had mortgaged Mr. Isaacs my cattle. I did have such an intimation. As to what I meant by stating to Mr. Isaacs that 100 head was about the number that should have been in that bunch, I meant that it was about the number of cattle; but I could not swear that it was the cattle. Yes, sir; after I saw the cattle, I called back and told Mr. Isaacs that everything was in good shape. I didn't call at the clerk's office to see what cattle Jones had mortgaged Isaacs. I asked Isaacs about it, and he didn't have the mortgage, and told me it was on record in this other county. I didn't go to the other county at that time. Yes; I had a suspicion that Jones had mortgaged the cattle. I have testified to that. I talked with Isaacs; then went over into Lipscomb county, where the cattle were, and had a talk with Jones, and Jones satisfied me. I never went to the records to see whether in truth and in fact Jones was mortgaging my cattle, although I had a suspicion that he was. Isaacs didn't tell me anything about the brands; he told me he would have to look for it [the mortgage], and he went and looked for it, and could not find it."

Aires testified that Kelly talked with him about Jones putting the cattle in the Aires pasture, but didn't say anything about owning the cattle. Isaacs testified that he had one conversation with Kelly after the loan was made, in which he told Kelly about making the loan to Jones and taking a mortgage on 100 head of yearlings, and that Kelly only said, "Where did he get them yearlings?" Isaacs testified further as follows:

"I had another conversation with Mr. Kelly before the loan was made. He was in the bank talking, and told me he was looking for Mr. Jones' cattle down here that was at Mr. Aires' at that time. I don't know whether he just said he was looking after Jones' cattle or not. We were talking, and he said he was helping Jones out; that he thought he was a good man, had known him a long time; that Jones had 320 acres of land in Wheeler county, and that he had sold him or traded him some cattle for, and he said that he owed a bank over there, and that he was looking for this thing—was interested in it; that he [Jones] was going to make good. He was talking about the cattle / that were at the Aires place. I understand it was Jones' cattle; I never once thought of them being anybody else's. I understood he was assisting him in carrying the debt, or something of that kind."

[2, 3] This testimony, in our opinion, would not warrant us in holding that Kelly is estopped from claiming the cattle as against the bank's mortgage, and fully sustains the jury in its findings that Kelly did nothing which would lead an ordinarily prudent person to believe that the cattle belonged to Jones, or that he had a right to mortgage them. Mere possession by a bailee of property is not sufficient to create any right in favor of a third party who takes a mortgage upon it, and the rule announced in the following cases applies here: Blum v. Merchant, 58 Tex. 403; Stratton-White Co. v. Castleberry, 15 Tex. Civ. App. 149, 38 S. W. 835; Watkins Land Mortgage Co. v. Howeth, 1 Tex. Civ. App. 277, 21 S. W. 315. The testimony quoted above, taken most strongly against Kelly, does not show that the bank is in a position to claim estoppel against him, as the loan was made upon the strength of representations made by Jones, without the knowledge of Kelly, before its execution. Under the testimony of Isaacs, detailing the conversation between himself and Kelly, prior to the time the bank made the loan, the jury might have concluded that Kelly was estopped; but, their finding being to the contrary, there is sufficient evidence to sustain it, and to show that the bank is not in a position to urge the defense of estoppel. Anderson v. Walker, 93 Tex. 119, 53 S. W. 821; McLaren v. Jones, 89 Tex. 131, 33 S. W. 849; Waxahachie National Bank v. Beilharz, 94 Tex. 493, 62 S. W. 743.

Having concluded that appellant bank is not entitled to recover as against Kelly, the assignments attacking the sufficiency of Creath's mortgage and his right to recover are immaterial. If the cattle belonged to Kelly, Jones had no right to mortgage them, and the bank could acquire no greater right than its mortgagor had at the time the mortgage was executed. The bank is therefore not entitled to attack Creath's mortgage upon any ground.

The several assignments based upon the refusal of the court to submit certain special issues are overruled, as we think the

matters therein are included in the issues already submitted.

We find no reversible error, and the judgment is affirmed.