# FEBRUARY, 1941

JOHNNIE DELL GRIGSBY ET AL BY NEXT FRIEND W. R. FICKAS V. FIRST NATIONAL BANK IN QUANAH ET AL.

No. 7558. Decided November 6, 1940.
Rehearing overruled January 8, 1941.
Second rehearing overruled February 5, 1941.
(144 S. W., 2d Series, 244;
146 S. W., 2d Series, 174.)

*McWhorter, Howard & Cobb*, of Lubbock, and *Charles Nordyke*, of Stephenville, for plaintiff in error.

The payment by the First National Bank of Quanah of the individual debt of the guardian, Ruby G. Borders, to itself out of the guardianship funds derived from a sale of properties of the plaintiffs (minors) constituted a breach of trust on the part of the bank and was an act of conversion both on the part of the guardian, Mrs. Borders, and the First National Bank of Quanah. Moore v. Hanscom, 101 Texas 293, 106 S. W. 877; Commercial Bank v. Jones, 18 Texas 811; Wichita Royalty Co. v. City Natl. Bank of Wichita Falls, 127 Texas 158, 89 S. W. (2d) 394.

*E. L. Klett*, of Lubbock, for defendant in error.

The Quanah Bank did not convert the minor's money, because such bank did not receive any part of said money in payment of guardian's note executed in favor of bank, but the evidence shows that, after the sale of property was approved by the probate court and the proceeds deposited to guardian's credit in the bank, the guardian herself, received all such money when she transferred such funds from the Quanah Bank to a bank in Lubbock. Anderson v. Walker, 93 Texas 119, 53 S. W. 821; Clardy v. American Trust & Sav. Bank, 208 S. W. 990; Quanah, A. & P. Ry. Co. v. Wichita State Bank, 127 Texas 407, 93 S. W. (2d) 701.

MR. JUDGE TAYLOR delivered the opinion of the Commission of Appeals, Section B.

Johnnie Dell Grigsby and W. E. Grigsby, Jr., minors, brought this suit by next friend against the First National Bank in Quanah, Ruby G. Borders, their mother, and other defendants not parties here, for the recovery of $7,500.00. Judgment was for the defendants upon trial without a jury, which was affirmed by the Court of Civil Appeals. 125 S. W. (2d) 368.

Writ of error was granted upon the application of the minors acting through their next friend, W. R. Fickas.

The cause alleged on behalf of the minors was one for conversion by Mrs. Borders and the bank of funds received from a sale of the minor's properties about November, 1929.

The Court of Civil Appeals holds that while the books and records of the bank made a prima facie case in favor of the minors, the evidence offered by the bank by way of explanation of the transactions involved was sufficient to warrant the trial court in concluding that it did not receive any of the funds belonging to the minors, and that it applied none of such funds to the payment of Mrs. Border's note to the bank; and that for this reason neither she nor the bank was guilty of conversion.

We were not in accord upon consideration of the application for the writ with the conclusion stated with respect to the bank's explanation; and writ of error was granted upon the view that the Court of Civil Appeals erred in holding the evidence legally sufficient to explain away the prima facie case made by plaintiffs and support the trial court's judgment. Upon further consideration of the record we are confirmed in that view.

At the time of the transactions involved E. B. Caskey was president of the bank and J. D. Hughes was its vice president and cashier. So far as the record shows they were the only persons connected with the bank who knew anything about its part in the transaction. At the time of the trial Caskey was deceased and Hughes was president of the bank.

The matters here involved grow out of the purchase by Mrs. Borders of a bakery in Lubbock. Her husband, John I. Grigsby, had died in 1927 at Quanah and had left surviving him his wife, and the two children who are plaintiffs here. The father's interest in the community estate descended to the children. That interest consisted in the improvements on lot 19, block 6, of the town of Quanah. The improvements were the Bon Ton Bakery located thereon, together with the furniture, fixtures, tools and equipment used in connection with its operation.

Mrs. Borders, who was guardian of the person and estate of the minors from November 18, 1929, until sometime in 1936,* obtained, prior to November 15, 1929, an option to purchase a bakery in Lubbock. It was her plan to finance the purchase through a sale of the Quanah bakery. According to the testimony of Hughes she came to the bank to get him and Caskey to help her consummate a sale of the Quanah bakery to B. E. Harper, who was to purchase it for $20,000.00, and they agreed "to help her close the deal" for "a 5% commission on the $20,000.00." It appears that shortly prior to that time a contract of sale had been prepared by Judge C. Y. Welch (then a practicing attorney at Quanah), or by an attorney acting in conjunction with him, which provided that the $20,000.00 consideration was to be $10,000.00 as her part and $10,000.00 as the children's part for the children's one-half interest"; that the children's part was to be paid, *$7,500.00 in cash* and a note for $2,500.00, due in six months, and that *$10,000.00 was to be paid Mrs. Borders in notes, payment to begin eighteen months later*.

Mrs. Borders, according to Judge Welch's testimony, reported to him that her option on the Lubbock bakery was about up and that if she knew Hughes and Caskey would let Harper have the money she could go ahead with the deal for the Lubbock bakery, which she was anxious to make. Thereupon Judge Welch, after telling her "she would have to take out guardianship papers in order to complete the sale," sounded out the county judge to ascertain if he would approve the sale

*See opinion on rehearing, page 63.

to Harper on the terms stated above. Judge Welch upon being advised the county judge would approve such a sale made this known at the bank. He testified that after talking to the county judge he went back to the bank and that "they said then over there * * * they would put up the money." He further testified that "$7,500.00 in money was for the children's part of the property." It appears from Judge Welch's testimony that he did not know the details of how the matter was finally handled. He did testify that he knew of no source "from which that $7,500.00 would have come except from money put up in the bank"; also that "there was never any order in the probate court of Hardeman county (the county of which Quanah is the county seat) authorizing any part of the $7,500.00 to be invested or expended by the bank." The order of appointment of Mrs. Borders as guardian was made November 18, 1929, and the order approving the report of sale was made November 25, 1929.

The following excerpt from the statement of facts shows the material recitals of the $7,500.00 note, together with pertinant penciled notations made thereon by the bank:

"First National Bank, Quanah, Texas. $7500.00. November 15th, 1929. On demand after date we, I, or either of us, promise to pay to the order of the First National Bank in Quanah * * * Seventy-five Hundred and no/100 Dollars, * * * with interest at the rate of ten percent per annum from date until paid and 10 per cent attorney's fees * * *. Full authority is hereby given to the legal holder hereof to sell any collateral security assigned or attached, at public or private sale, without notice, upon nonpayment. (Signed) Ruby G. Borders, No. 30346. Due: D. (Penciled notation: Paid: 11/29/29.) (Penciled note on back of note: $6500.00, 14 days 25.27.)"

The following testimony of Hughes is taken from the record without observing the order in which it appears, the omission notations showing the terminations respectively of the excerpts:

Q. And that (a ledger sheet of the bank showing Mrs. Border's account) shows the date the money was put up? A. November 15th, yes sir. (That was three days before application for guardianship was filed)* Q. How much money was credited to that account on that date? A. $6500.00. Q. And (the note) you took in return, that was for the $7500.00? A. Yes, sir. * * * Q. Was that money, namely, the $6500.00, to be

---

*See opinion on rehearing, page 63.

held in escrow until the completion of the sale to Harper? A. Yes sir. Q. Was that money paid to her as the proceeds of the sale of the children's half-interest in the Bon Ton Bakery? A. I suppose so. * * * Q. This is a deal between you and the guardian, and the guardian, or you for her, placed $6500.00 in escrow? A. It was placed to this account here. * * * Q. Then you did not place it in escrow? A. Not other than this account here. Q. That was placed in here on November 15th, 1929, and at the same time you did that you required Mrs. Borders or she did make an individual note? A. Yes sir. Q. And you claim now that this note belonged to you and Caskey? A. I said that we were responsible for the note and she understood that the children were to pay it. * * * Q. I believe that you say that you and Mr. Caskey were to get five per cent commission of the $20,000.00 deal or a commission of $1,000.00? A. Yes sir. Q. Did you gentlemen get that money? A. Yes sir. Q. Did you get it out of that $7,500.00? A. Yes sir. Q. So you were getting $1,000.00 as commission on the transaction? A. Yes sir. Q. You were taking it out of the cash payment of $7,500.00? A. Yes sir. * * * Q. You and Mr. Caskey did not own the note? A. We did not own it, no sir. Q. But you were going to see that it was paid? A. Yes sir. Q. You overlooked assigning the note to the bank? A. We did not intend to sign it over to the bank. Q. And you didn't endorse the note? You were not under the impression that the bank would require you to pay the note you did not sign, were you? A. I don't know about being under that sort of impression. I stated that Mrs. Borders knew that she did not have to pay the note. Q. You stated under direct examination that you and Mr. Caskey as individuals did all of this? A. Yes sir. Q. But now you say that the note belonged to the bank? As a matter of fact considered as part of the assets of the bank, wasn't it? A. Yes, sir, it was. * * * Q. Mr. Hughes, the bank collected off of this note, off of Ruby Borders on this note that she executed to the bank the sum of $25.27 as interest for 14 days? A. Yes. Q. In other words the note was not paid out of the children's fund until 14 days later? A. I don't know just how that is there. As to the interest, Mrs. Borders was willing to pay the interest to get the money available. Q. But it was paid and paid to the bank? A. Yet sir."

The following is the material part of a letter written by Hughes to Mrs. Borders on behalf of the bank on November 29, 1929, concerning the note:

"Mrs. Ruby G. Borders, Lubbock, Texas. Dear Mrs. Borders: We are enclosing herewith your note for $7500.00 marked

'Paid.' The Harper deal was closed today which paid this note in full and we have charged your account with $25.27 covering the interest for fourteen days on $6500.00. * * *. Yours very truly, (Signed) J. D. Hughes, Vice-Pres."

The basis of the holding of the Court of Civil Appeals is the following excerpt from its opinion:

"On November 15, 1929, before the probate court had authorized the sale of the property belonging to the minors, Mrs. Ruby G. Borders drew a draft on the First National Bank of Quanah, Texas, for the sum of $11,000.00, payable to the Citizens National Bank of Lubbock. After the order of the court had been obtained authorizing the sale and Messrs. Caskey and Hughes had advanced the cash payment required for the sale to be completed and subsequent to the consummation thereof, the bank of Quanah paid, on November 19th, to the bank of Lubbock on the draft the sum of $11,000.00. Mrs. Borders was the qualified guardian of the person and estate of the minor plaintiffs and the bank was authorized to pay the money on her draft. Quanah, A. & P. Ry. Co. v. Wichita State Bank & Trust Co., 127 Texas 407, 93 S. W. (2d) 701, 106 A. L. R. 821. The record indicates that Mrs. Borders exercised her option to purchase the Dandy Bakery in Lubbock and that the money evidenced by the draft for $11,000.00 was used to pay therefor. The testimony shows that the note for $7,500.00 given to the bank by Mrs. Borders was not intended as a loan and that since the sale of the Quanah property was consummated as per contract, no financial obligation was evidenced by the note and that the bank, through its officers, so understood and that none of the proceeds derived from the sale of the property belonging to the minors was applied either by the guardian or the bank to the payment and satisfaction of said note. * * * In our opinion, the testimony is amply sufficient to warrant the court in concluding that the appellee bank did not receive or apply any of the funds belonging to the minors to the payment of the individual note of Mrs. Borders and that neither she nor the bank was guilty of conversion."

The $11,000.00 draft of Mrs. Borders above referred to was drawn on the Quanah bank on November 15, 1929, ten days* before the order was made appointing her guardian of the estate of the children. The endorsements on the draft show that it was endorsed by the Lubbock bank on the date it was

---

*See opinion on rehearing, page 63.

drawn, by the First National Bank of Fort Worth on November 16th, by the Federal Reserve Bank of Dallas on November 18th, and that it was paid by the Quanah bank on November 19th, the day after the application for appointment as guardian was filed.*

The above excerpts from the record reveal the transactions from the bank's standpoint, and show the construction the officers of the bank, especially Mr. Hughes, placed thereon at the time they occurred.

■ We are not in accord with the view of the Court of Civil Appeals stated in the conclusion of that part of the opinion quoted above. The testimony shows with reasonable certainty, looking through form to substance, that Mrs. Borders, the bank, and its officials, knew the true source of the $7,500.00 was the interest of the minors in the Quanah bakery; and that having such knowledge, they acted together in applying the proceeds of the sale of that interest to the payment of Mrs. Border's indebtedness to the bank and its officials, all of whom directly benefitted thereby. For this reason the case is not controlled by the Quanah, A. & P. R. Co. case, supra, but rather by United States Fidelity & Guaranty Company v. Adoue & Lobit, 104 Texas 379, 137 S. W. 648, 138 S. W. 383, 37 L. R. A. N. S. 409, and Wichita Royalty Company et al v. City National Bank, 127 Texas 158, 89 S. W. (2d) 394. The vital distinction between the Quanah case and the case last referred to, that of the profit derived by those taking part in the transaction, is pointed out in the opinion in the Quanah case and need not be restated here. The same distinction obtains between the Quanah case and the present case. Both the bank and the bank officials derived direct benefit through the Harper deal, regardless of whether it was a deal having reference to the sale of the property to Harper, or to what Hughes claims was an escrow transaction whereby $7,500.00 was placed in the bank by him and Caskey as a loan to Harper to be held in escrow for Mrs. Borders, who later checked it out.

Nor has the case of Anderson v. Walker, 93 Texas 119, 53 S. W. 821, any application to the present facts, other than as authority that the above evidence, some of which was not in accord with the bank's record, was admissible to show what the transaction was, and that the "purposes of the parties are to be deduced from the whole of such evidence."

Hughes, when pressed upon cross examination for an explanation of certain matters shown by the bank's records in their relation to the escrow theory, testified in part:

Q. At the time that you gave her credit for the $7500.00, November 15th, the bank gave her credit for $6500.00 in her individual account, did it not? A. To be kept in escrow until the deal was closed. Q. And on that same date she executed a note for $7500.00, including this $7500.00? A. Yes sir. Q. And that was some two or three days before the confirmation of the sale to Mr. Harper by the Court, and the sale had not been completed at that time? A. I would not attempt to answer that. I don't remember those dates. Q. And if the record would show, and for your information it does show, that it was on November 25th, then you paid out that $11,000.00 on the individual check of Ruby Borders some six days before this sale was made? A. The Bennie Harper sale? Q. If this date, November 25th is correct. A. *I would not attempt to answer.* * * * Q. The Harper deal, as you recall it, was closed on what date with reference to the time that the money was placed to Ruby Borders personal account? A. *I don't believe that I could answer that.* I don't believe that I could give you that date. It was closed before this $11,000.00 check was paid. Q. *Then why did you charge her $25.00 for 14 days interest? A. I don't know why that delay came about.* Q. There was a delay or you would not have overcharged her for 11 days? A. The delay was evidently because it was in the fall of the year, thru the busy season, and it was evidently neglected because of that condition. The banks get all of the interest that they can and maybe lose it all in one deal later on. *I would not attempt an explanation of that.* Q. You have your record showing where the money was paid in by Harper and to whose account it was credited, do you not? A. We paid the money, Mr. Caskey and I. Q. Does your record show when it was paid in the bank? A. No sir. Q. Does the bank have a record of that? A. No sir. *I would not say just what record we did have.* Q. What account did you gentlemen pay those to? A. To take up this note. Q. *To take up the note? A. Yes sir. Q. That Ruby Borders had made? A. Yes sir. Q. And you paid it to the bank? A. Yes sir.* (Italics ours).

The foregoing evidence does not explain away the prima facie case of the minors; and the evidence as a whole is not legally sufficient to show, as stated by the Court of Civil Appeals, that the bank "did not receive or apply any of the funds belonging to the minors" to the payment of Mrs. Border's note. On the other hand it shows to a practical certainty that they were so applied, thus placing both the bank and Mrs. Borders in the position of having converted the proceeds of the $7,500.00 note on November 29, 1929.

■ Whether Hughes and Caskey as agents of Mrs. Borders in rendering her the services for which they were paid $1,000.00, regarded the $7,500.00 as Harper's money or Mrs. Border's money made available to her as above shown, is immaterial, at least so far as the bank's liability, or that of Mrs. Border's, is concerned.

The trial court's judgment should have been in favor of plaintiff in error for that amount, with interest. The Court of Civil Appeals erred in affirming the judgment in favor of the defendants. The judgments below are reversed and set aside and judgment is here rendered for plaintiffs in error against defendants in error for $7,500.00, with interest at the rate of 6% from November 29, 1929.

Opinion adopted by the Supreme Court November 6, 1940.

### ON MOTION FOR REHEARING.

It is correctly stated in the opinion in this case at the beginning of the eighth paragraph that Mrs. Borders was guardian of the minors from "November 18, 1929, until sometime in 1936." Complaint is made in the motion for rehearing that it is later incorrectly stated that November 15th "the date the money was put up," was "three days before application for guardianship was filed"; also that "November 19th" is later stated to be "the day after the application for appointment as guardian was filed." Both statements are erroneous. The word granted should have been used instead of the word filed. The application was filed on November 6th, and was granted on November 18th. The opinion is hereby corrected so as to substitute the word "granted" for "filed" in the statements referred to. The further statement that the $11,000.00 draft was drawn by Mrs. Borders "ten" days before her appointment as guardian is also corrected so as to make it read "three" days before her appointment.

The errors pointed out and corrected have no bearing on either the conclusion reached, or the reasoning by which it was reached.

The bank sets up in its motion for rehearing the sole ground that the court erred in finding there is no evidence that the guardian received the cash payment made for the minor's property.

The Court's conclusion that the bank is liable is predicated upon no such finding. The entire motion for rehearing is taken up with pointing out and discussing testimony to the effect

that the terms of the sale of the minor's property to Harper were complied with and that Mrs. Borders received payment therefor. These facts are not questioned here and were not questioned upon original hearing.

The bank is liable, not upon the ground that Mrs. Borders did not receive payment for the minor's property sold by her, but upon facts pointed out by the bank's witnesses in connection with the prearranged method between Mrs. Borders and the bank and its officials whereby the payment was consummated with the result that the cash paid for the minor's property was made available to Mrs. Borders for her individual use to enable her to purchase the Lubbock bakery.

The effect of the bank's contention is, and was upon original hearing, that the making of the payment to Mrs. Borders for the minor's property to Harper in the manner and with the result stated, when explained by the bank's witnesses, relieves it of liability. The interpretation of the explanation by counsel for the bank in his supplemental argument is in effect that the cash was received by Mrs. Borders through the prearranged bank transaction, not as an individual loan to her, but as payment for the purchase price for the minor's interest in the property.

That contention was overruled upon original hearing and is here overruled. The conclusion is predicated not upon a disbelief of the bank's testimony, as counsel for the bank seems to infer, but upon the legal effect and consequences of that testimony. The mere fact that Mrs. Borders received payment does not relieve the bank of liability in the face of the bank's own testimony showing that the bank and its officers in the process by which payment was made, participated in making the minor's funds available to Mrs. Borders individually in the manner pointed out in the original opinion. There is no distinction from the standpoint of legal consequences between making the cash proceeds of the sale of the minor's property available upon the personal check of Mrs. Borders by means of a loan to her, and making it available for her personal use in the form and manner pointed out under the bank's explanation of the details as to how the transaction was handled. Counsel in his supplemental argument for the bank upon original hearing interprets the bank's explanation as follows (the language quoted being counsel's save that of the last two parentheses, which is inserted in keeping with the bank's testimony) : "Under a three-way or four-way deal, Messrs. Caskey and Hughes (or the bank for Messrs. Caskey and Hughes or at their instance) on No-

vember 15 (three days before she became guardian) deposited the required cash payment in the bank and the bank carried said money to the credit of the guardian, (in her individual account) with the understanding it was not a loan to her, *and not subject to her check until the guardianship sale was completed. * * *.*" (Italics ours). Counsel further states in connection with the interpretation that "It may be, of course, that the transaction was awkwardly handled, and that some of the explanations may not appear reasonable or consistent, but nevertheless, under the opinion of Judge Williams in the Anderson, case, supra, the transaction was subject to explanation, in which the trial court, as well as the Court of Civil Appeals, had the right, as they found, to believe that Judge Welch and Mr. Hughes told the truth."

As pointed out above the disagreement of this Court with the courts below is not predicated upon a failure to give credence to the testimony of the bank's witnesses, but upon the legal effect of that testimony, which alone is made the basis of the original opinion. Furthermore there is no paralled from the standpoint of the legal consequences flowing from the explanation of the purpose of the execution and handling of the note in the Anderson case and those flowing from the execution and handling of the note by Mrs. Borders in the present case. In the Anderson case the explanation was to the effect that the note made to the bank by Jernigan was made after he had already converted the county's funds and constituted no part of the process whereby the conversion was consummated by him.

As stated in effect in the opinion upon original hearing, "looking through form to substance" the true source of the $7500.00 was the minor's property, and such use was made of it by Mrs. Borders, the bank and its officials, jointly, in the process of making it available to her individually, as to invoke the principles applied in the Adoue and Lobit and Wichita Royalty Company cases cited in the opinion; and, as further pointed out in the opinion, whether the $7500.00 furnished by Hughes and Caskey and credited by them to Mrs. Borders' individual account in the bank was Harper's money originally or Mrs. Borders', is immaterial so far as her liability, or that of the bank, is concerned.

After full consideration of the motion for rehearing we adhere to our opinion upon original hearing. The motion is overruled.

Opinion adopted by the Supreme Court January 8, 1941.
Second rehearing overruled February 5, 1941.