## FENNER et al. v. AMERICAN SURETY CO. OF NEW YORK.
### No. 11995.

Court of Civil Appeals of Texas. Dallas.
Sept. 26, 1936.

Rehearing Denied Oct. 31, 1936.

Smithdeal, Shook, Bowyer & Lefkowitz, of Dallas, for appellants.

F. W. Bartlett and Thornton & Montgomery, all of Dallas, for appellee.

JONES, Chief Justice.

In a suit in a district court of Dallas county, appellee, American Surety Company of New York, obtained a judgment in the principal sum of $27,141.77, with the additional sum of $5,156.81 as accrued interest, at the rate of 6 per cent. per annum from February 10, 1931, against appellants, Charles E. Fenner, A. C. Beane, and eight other individuals, composing a partnership, doing a brokerage business under the firm name of Fenner & Beane, and appellants have duly perfected an appeal to this court. The following are the facts:

Fenner & Beane have their home office in the city of New Orleans, La., and all of the members of that firm live outside of the state of Texas, except E. H. Hulsey, who resides in the city of Dallas. Appellants maintained a branch office in the city of Austin, of which Leigh Ellis was the manager and R. W. Nixon was the "customer's man." Appellee is a foreign corporation, legally doing business in Texas, and issues fidelity insurance, guaranteeing the integrity of employees. Appellants are stock brokers selling stock either for delivery or on margin. One Carl A. Lundelius was an employee of the American National Bank at Austin and held the position of exchange teller in said bank, and appellee issued to such bank a fidelity bond for Lundelius. His duties were those of issuing items of exchange for the bank, handling collection of items that came into the bank for collection, and making remittances to corresponding banks. Lundelius had no authority to sign drafts or items of exchange. It was his duty, however, to write up such instruments, to be signed by an assistant cashier of the bank, named Pfaefflin.

In the summer of 1929, prior to the transactions brought under review in the trial of this suit, Lundelius abstracted about $18,000 from his employer's bank and invested same in a grape-brick concern, and this investment was evidently a loss in such amount to Lundelius. Subsequent to his loss in this business venture, he approached Ellis, appellants' manager in the city of Austin, and asked for an explanation of how he, Lundelius, could operate on the stock market, desiring to do so probably for the purpose of recouping his losses and making good his defalcation at the bank. After being educated in this respect, on November 4, 1929, Lundelius purchased stock from Fenner & Beane through their Austin office, which was in the same building with the American National Bank. Lundelius explained that he did not want his employer to know that he was playing the stock market, and was assured by Ellis that it would not be so informed.

In his first purchase of stock, Lundelius presented to appellants an American National Bank draft, payable to appellants for $2,000; eight days later he presented a similar draft for $6,627.50; six days thereafter a similar draft for $18,900, and on the following day presented a similar draft for $29,950. These drafts were genuine, regular on their face, and signed by the assistant cashier of the bank, whose duty it was to sign such drafts. These four transactions were handled through appellants' main office at New Orleans, but at the suggestion of Ellis in order to facilitate the collection of the drafts, Lundelius opened an account with the Austin National Bank, at Austin, Tex.

After Lundelius opened an account in the Austin National Bank, he would take items of exchange from the American National Bank, signed by Pfaefflin and payable to the Austin National Bank at Austin, and either deposit them to his own account or to the account of Fenner & Beane in the Austin National Bank. All of these various items in exchange were paid by the banks upon which they were drawn and were returned to the American National Bank, which made no complaint as to the validity of the items until long after they were made and Lundelius' abstractions had been discovered.

On or about December 31, 1929, the home office at New Orleans discovered that Lundelius was an employee of the American National Bank, and Fenner, the managing partner of Fenner & Beane, at once advised the Austin office that Lundelius must get written consent of an officer of such bank, permitting him to invest in stocks, or the account must be closed. Lundelius, when informed of this order, promised to get the written consent, but this he never obtained, and his account with appellants was closed about January 8, 1930. No other business after December 31, 1929, was accepted by appellants in the name of Lundelius. Lundelius then attempted to operate under a fictitious name, opened an account in an-

other Austin bank, and two items of exchange were consummated by the use of such name. The new depository bank in which Lundelius opened his account, telephoned Lundelius, at the American National Bank, to thank him for opening such account. Lundelius was absent, and the representative communicated with the cashier of the American National Bank, in lieu of Lundelius, and told him he wanted to thank Lundelius for opening the account. When the American National Bank was apprized of this fact, it instituted an investigation and Lundelius' defalcations were discovered.

The record discloses that Lundelius operated in the following manner: Items of exchange would come in from other banks to the American National Bank to be collected, Lundelius would collect these items but would withhold remittances and issue the drafts and cashier checks either to himself or to Fenner & Beane. These items of exchange would be presented to Pfaefflin and were by him signed. When other items came in for collection, Lundelius would collect them and remit for the items that had already come in. The total amount of the items abstracted in this manner by Lundelius was $168,237.50. When available deposits had been credited, Lundelius was short in his account the sum of $77,135.94. When other funds available for this purpose had been credited, there was left a shortage of $45,081.28. Appellee, after some available credits were made, paid to the American National Bank the sum of $31,241.77, and instituted this suit against appellee to recover the amount paid. This amount represented both principal and interest, and on trial of the case the judgment above described was entered.

The pleadings of the parties raised all the issues submitted by the court. These pleadings, especially those of the appellants, are voluminous, but we do not deem it necessary to specifically refer to them. All of the defensive issues that were responsive to the theory of the case, as relied upon by appellee and as adopted by the court, were submitted by the court and found against appellants.

Appellee's theory, as shown by its pleadings and adopted by the court as the correct theory, is that appellants, through their agents, Ellis and Nixon, in full charge of their Austin office, were in possession of such facts and circumstances as would charge a reasonably prudent person with notice that the funds with which Lundelius operated may have been abstracted from the American National Bank, and that such an investigation as a reasonably prudent man would have made of said facts, would have disclosed that Lundelius had abstracted such funds from the bank.

Appellants contend that as all of the written instruments, by means of which Lundelius abstracted funds from the bank, were negotiable instruments, · regularly drawn and showing no infirmity on their face, appellants must have had actual knowledge of Lundelius' dishonesty before they can be required to make good his defalcation, and that implied knowledge, because of their ' failure to inquire into the validity of each negotiable instrument, is not sufficient to charge them with responsibility.

The case was submitted to the jury on 52 special issues. It is not deemed necessary to set them out in their entirety. The findings are sufficient to warrant the judgment rendered by the trial court, provided the court adopted the correct theory in submitting the case to the jury. There were twelve items of defalcation, and we shall quote only the charge submitting to the jury one of these items, the court having adopted the same method of submission as to each separate item:

"Special Issue No. 1: Do you find from a preponderance of the evidence, that the draft on the First National Bank of Houston, Texas, introduced in evidence, for $2000.00 dated November 4th, 1929, payable to Fenner & Beane and used by Carl A. Lundelius in his first transaction with Fenner & Beane, was wrongfully obtained by the said Carl A. Lundelius, from the American National Bank of Austin, Texas? Answer this question 'yes' or 'no.' Answer: Yes.

"Special Issue No. 2: Do you find from a preponderance of the evidence, that the facts and circumstances in evidence, if any, known to Leigh Ellis and R. W. Nixon, or either of them, at the time Carl A. Lundelius began trading on the stock market, through Fenner and Beane, were such as to put a person of ordinary prudence, situated as said Ellis and said Nixon then were, upon inquiry as to whether or not said draft on the First National Bank of Houston, Texas, for $2000.00, dated November 4th, 1929, payable to Fenner & Beane, and used by Carl A. Lundelius in

his first transaction with Fenner & Beane, had been wrongfully obtained, if it was, by the said Carl A. Lundelius, from the American National Bank of Austin, Texas? Answer this question 'yes' or 'no.' Answer: Yes.

"Special Issue No. 3: Do you find from a preponderance of the evidence, that such inquiry, upon the part of Leigh Ellis and R. W. Nixon, or either of them, as a person of ordinary prudence would have made under the same or similar circumstances, would have disclosed that said draft had been wrongfully obtained, if it was, by said Carl A. Lundelius, from the American National Bank of Austin, Texas? Answer this question 'yes' or 'no.' Answer: Yes."

The court made the same submission and the jury made the same answer in respect to the item of a draft of $6,627.50, on the First National Bank of Houston, dated November 12, 1929, payable to Fenner & Beane; in respect to the item of $18,900 dated November 18, 1929, represented by a draft on the First National Bank of Houston, payable to Fenner & Beane; in respect to the item of $29,950 dated November 19, 1929, payable to Fenner & Beane, represented by a draft on the First National Bank of Houston; in respect to the item of $5,600 represented by a cashier check of the American National Bank, payable to Austin National Bank of Austin, dated November 25, 1929; in respect to the item of $6,700 represented by a draft on the First National Bank of Houston, dated November 27, 1929, and payable to the Austin National Bank; in respect to the item of $11,000, represented by a draft on the Chase National Bank of New York, dated November 4, 1929, payable to the Austin National Bank of Austin; in respect to the item of $15,000 represented by draft on the First National Bank of Houston, dated December 4, 1929, and payable to the Austin National Bank at Austin; in respect to the item of $24,000, represented by a draft on the First National Bank of Houston, dated December 6, 1929, and payable to the Austin National Bank at Austin; in respect to the item of $5,000, represented by a draft on the First National Bank of Houston, dated December 9, 1929, payable to L. T. Taylor; in respect to the item of $2,960 represented by a draft on the First National Bank of Houston, dated December 16, 1929, and payable to L. T. Taylor; in respect to the item of $22,500 represented by a draft on the First National Bank of Houston, dated December 17, 1929, and payable to the Austin National Bank; in respect to the item of $18,000, represented by a draft on the Chase National Bank of New York, dated December 30, 1929, and payable to the American National Bank.

In response to special issue No. 40, the jury found that the aggregate sum of money wrongfully obtained by Lundelius from the American National Bank was the total sum of $168,237.50. In response to special issue No. 41, the jury found that this entire sum of money was received by appellants from Lundelius in his stock transactions with appellants. In response to special issue No. 42, the jury found that the American National Bank was reimbursed by Lundelius in the sum of $141,095.73. The principal in the judgment is represented by the difference between the amount of the defalcation and the amount of the reimbursement, which is the sum of $27,141.77.

The defensive issues submitted on behalf of appellants, in so far as such issues are material, were found in favor of the appellee. These findings are supported by evidence and adopted as the findings of this court. The main issue, therefore, is: Are the findings a sufficient basis for the judgment rendered?

All of the instruments used by Lundelius in the abstraction of money from the American National Bank were negotiable instruments, regular in every respect on their face. It will be noted that in the submission of each item of the alleged abstraction of money, the issue submitted was whether or not "the facts and circumstances in evidence, if any, known to Leigh Ellis and R. W. Nixon, or either of them, at the time Lundelius began trading on the stock market through Fenner & Beane, were such as to put a person of ordinary prudence, situated as Ellis and Nixon then were, upon inquiry as to whether or not" the money abstracted had been wrongfully obtained by Lundelius from the American National Bank. Immediately following such submission, there was submitted the issue, whether such inquiry would have disclosed that the instruments, by means of which the money was obtained, had been wrongfully obtained by Lundelius from said bank.

Under such submission, the duty rested upon appellants, before they purchased a negotiable instrument regular on

its face, and with no actual knowledge of its infirmity, to make inquiry as to all the available facts and circumstances of such negotiable instruments, for the purpose of determining if Lundelius was in fact the owner, and if they did purchase such instruments without such investigation, they did so at their peril. Such is not the law in this state in respect to the purchase of negotiable instruments. Quanah, A. & P. Ry. Co. v. Wichita State Bank & Trust Co. (Tex.Sup.) 93 S.W.(2d) 701, 704, and authorities therein cited on this question; American Surety Co. of New York v. Bache et al. (Tex.Civ.App.) 82 S. W.(2d) 181, 182 (writ of error denied). In the first case above cited, the Supreme Court speaking through Judge Critz, declares it to be "the settled law of this state that the ordinary rule of notice does not apply to the purchaser of a negotiable instrument for a valuable consideration before maturity. The test in negotiable instrument cases is good faith, and not diligence or negligence. Unless the purchaser has actual knowledge of facts and circumstances that would render the paper noncollectible, or has knowledge of such facts as that a purchase of the instrument would amount to bad faith, it is immaterial that he has notice of such facts as would put a reasonably prudent person on inquiry, and that such inquiry would lead to discovery."

In the case of the American Surety Co. of New York v. Bache, supra, a case very similar in all its details to the one at bar, learned counsel for the American Surety Company of New York urged the following proposition as the law of that case: "Knowledge on the part of appellees' agents of facts and circumstances sufficient to put a person of reasonable prudence on inquiry, where such inquiry if pursued with reasonable diligence would have disclosed that Kincaid [the defrauding employee of the Bank] was wrongfully using the bank's funds in his individual stock transactions, was the equivalent in law to knowledge on the part of appellees of such misappropriations, and made them liable for as much of said funds as they received,":

The Court of Civil Appeals refused to adopt this proposition as a correct statement of the law, but, on the contrary, declared the law to be that the purchaser of the negotiable instruments in that case must have had actual knowledge that Kincaid had wrongfully abstracted the money from the bank of which he was an employee. The Supreme Court denied a writ of error and subsequently announced the same rule of law in the case of Quanah, A. & P. Ry. Co. v. Wichita State Bank & Trust Company, supra.

There is a section of our negotiable instrument statutes which we think also governs this case. Section 56 of Article 5935 R.S. declares that, "To constitute notice of an infirmity in the instrument or defect in the title of the person negotiating the same, the person to whom it is negotiated must have had actual knowledge of the infirmity or defect, or knowledge of such facts that his action in taking the instrument amounted to bad faith." While appellee cites credible authority to sustain its theory of this cause of action, as adopted by the trial court, we are of opinion that, under the statute above quoted and under the decisions herein cited, the court was in error in the manner of the submission of this case.

We cannot agree to appellants' contention that the case should be reversed and rendered in their favor. It is true that no direct evidence that appellants' agents at Austin, who handled these transactions for appellee, had actual knowledge of the wrongful abstraction of money from the American National Bank, but generally the question of actual knowledge is an issue of fact to be determined by the jury; also the issue of bad faith is generally a question of fact to be determined by the jury. We are inclined to the opinion that the evidence, at least, raises the issue of bad faith on the part of the agents of appellants in their dealings with Lundelius. Bad faith is generally defined to be the antithesis of good faith, and always carries with it the suggestion of dishonesty. So, we are of opinion that because of the fact that the case was submitted to the jury on a wrong theory, this case must be reversed and remanded for another trial.

It is insisted, as shown by bill of exception and proper assignment of error, that reversible error was committed in the admission of the evidence by deposition of one J. J. McCook, a resident of California. The witness was passing through the city of Austin and stopped for a short visit with his daughter, who was attending the state university. R. W. Nixon was going with McCook's daughter, and the three dined together some time in the

early days of December, 1929. This visit was during the time of the Lundelius transactions with the branch office at Austin· of appellants. During their conversation, Nixon mentioned the fact that a man "had been playing the market pretty heavily and at one time had made lots of money; but now, that they had to call on him for margins as he was still in the market, and taking some big losses, but that he always provided the money for his margins; that the man worked in a bank, and he thought that he was—he was fearful that he was not getting the money that he was putting up for these margins from the bank in a proper way." This evidence was objected to "for the reason that it is hearsay and contains opinions and conclusions of the witness, speaks about an unidentified man, who is not anywhere properly identified by the witness in the deposition." The objection was overruled and the evidence was admitted. The bank mentioned by the witness was identified as the American National Bank of Austin, and while the witness did not remember the name of the man, when the name of Lundelius was shown to him, he identified it as the name of the man who was the subject of conversation, and that portion of the objection is overruled.

■ Generally speaking, the casual statement of an agent, when not acting in the course of his principal's business, is not admissible. Southern Surety Co. v. Nalle & Co. (Tex.Com.App.) 242 S.W. 197, 201; Guarantee Bond & Mortgage Co. v. Bain (Tex.Civ.App.) 16 S.W.(2d) 554; Wichita Valley R. Co. v. Brown (Tex.Civ.App.) 274 S.W. 305; Missouri Pac. Railway Co. v. Sherwood, 84 Tex. 125, 19 S.W. 455, 17 L.R.A. 643. Should such rule be applied in the instant case? We do not think so.

■ Nixon is described as the "customers' man." From such designation we understand that clients of Fenner & Beane dealt primarily with Nixon, and that he acted for the principal with the clients in all transactions with the office. Knowledge that came to him in respect to such clients necessarily became the knowledge of Fenner & Beane. The issue of fact to be proven in this case is, not only, did Ellis, as manager of the Austin branch, or. Nixon, as customers' man of the Austin branch, have actual knowledge of the fact that Lundelius was operating on money abstracted by him from the bank, but

also, did Ellis or Nixon have actual knowledge of facts and circumstances, at the time they accepted from Lundelius these negotiable instruments, as that a purchase of such instruments would amount to "bad faith" on their part? We believe such evidence is admissible on the issue of "bad faith," and overrule this assignment of error.

All other assignments not herein specifically discussed have been examined and overruled. This case is reversed and remanded.

Reversed and remanded.

BOND, J., agrees to the disposition of this case, but dissents to the holding of the majority on the admissibility of the evidence of the. witness McCook, detailing the conversation had by the witness with Nixon, believing that such conversation is but the expression of an opinion of Nixon as to his personal views of the party referred to, which would not be binding on appellants.