TEXAS UTILITIES FUEL COMPANY, McMahon-Bullington Drilling Company, a Partnership, and John L. McMahon, Joseph K. McMahon and Ralph E. Bullington, Individually, Appellants,

v.

Lois Anderson CLAYTON et al., Appellees.

No. 18147.

Court of Civil Appeals of Texas, Fort Worth.

March 1, 1979.

Rehearing Denied April 12, 1979.

Worsham, Forsythe & Sampels and Michael R. Johnson, Dallas, for Texas Utilities Fuel Co.

Jennings, Montgomery, Dies & Turner and Frank L. Jennings, Graham, for McMahon-Bullington.

Gray, Whitten & Loveless and John L. Sullivan, Denton, for appellees.

## OPINION

**MASSEY, Chief Justice.**

By our opinion in this venue case we affirm the judgment of the trial court overruling all pleas of privilege.

The primary difficulties have been occasioned by the defendants having incorporated into their respective pleas of privilege the allegation that the facts averred in the plaintiffs' petition were not made in good faith. Since a cause of action for the recovery of interests in land located in the county of suit was alleged by plaintiffs' pleadings, their right to have venue retained in the county of the suit—upon proof made only that the land was located in the county—is without dispute. *Piazza v. Phillips*, 153 Tex. 115, 264 S.W.2d 428, 429 (1954).

■ However, in view of the pleas that there was a want of good faith in the allegations of plaintiffs' pleading the case ceased to be one in which venue might be held established merely by the pleadings plus proof upon location of the land. (At least it is not such a case once anything might be introduced into evidence indicative that plaintiffs' allegations were not made in good faith.) Presumption therefore obtaining that plaintiffs' allegations were made in good faith disappear and constitute matter to be proved by the plaintiffs once the defendants' evidence shows the existence of an issue of fact upon plaintiffs' good faith. *Thomas v. Ralph E. Fair, Inc.*, 556 S.W.2d 603, 607 (Tex.Civ.App.—Corpus Christi 1977, no writ). A case holding likewise, by implication, was *Batex Oil Company v. LaBrisa Land and Cattle Co.*, 352 S.W.2d 769 (Tex.Civ.App.—San Antonio 1961, writ dism'd).

In such a case a court must understand the meaning of the terms "good faith" and "bad faith" in the material context; i. e., in the allegation of those facts in a plaintiffs' petition essential to confer venue in a suit to recover land. Here this has relation to plaintiffs' theory upon appropriate remedy, to-wit: the prior actionable fraud in the inducement of plaintiffs to part with title as applied to the land which is sought to be recovered by their suit.

## The instant venue case—background

Plaintiffs below were Lois Anderson Clayton and her kindred, all hereinafter termed as the Claytons. Defendants were individual partners to the partnership McMahon-Bullington Drilling Company, and also that partnership, collectively hereinafter termed M–B; plus Texas Utilities Fuel Company, a corporation, hereinafter termed TUFCO.

On July 14, 1962 the Claytons had made over to M–B an oil, gas and mineral lease covering 2,415 acres in two tracts, located principally in Jack County but in part in Palo Pinto County, Texas. The lease was effective that date, for a period of 5 years, with provisions for annual specified "delay rentals" in the event drilling operations were not begun at specified times. In other words, M–B was not bound to drill for oil or gas, but held the ⅛th "working interest" for 5 years. In the event operations were begun and production obtained M–B's right in the title extended as in normal cases, including the right to assign such "working interest" to others. By what might or might not be an appropriate construction of the contract of lease the Claytons contend that thereby, in the event of gas production, they would be entitled to have the appropriate one-eighth royalty payments measured by the yard-stick of market value at time of the production.

M–B's acquisition of the lease was pursuant to its desire to "block up" a leased area of 30,000 acres, of which the Claytons' property was a part, for prosecution of a plan to accomplish drilling operations thereon in the hope of obtaining production. In the acquisition it employed the services of a Mr. Joe Vickers, who was in business as independent contractor. There is no question but that Vickers was agent of M–B for purposes of lease acquisition. As a part of his compensation for services, at least as applied to the land leased from the Claytons, Vickers received "interests" in the "working interest" acquired by him as agent for M–B. Joe Vickers induced the

Claytons to make the lease. All his conversations leading up to the execution of the Claytons' lease was with a Mr. Joe Skiles, husband of one of those embraced in the group we term the Claytons.

M–B did not individually seek to develop any of the leased acres which Vickers "blocked up". Rather did M–B seek to make a deal which would result in exploration for oil and gas by some other party, with provision that if such proved successful they would possess an interest therein. Such a transaction was effected by a contract called "Assignment of Oil and Gas Lease" executed by M–B to TUFCO approximately one year after the Claytons leased to M–B. In connection with that contract the operation privilege became that of TUFCO, at least for a period in excess of that with which we are concerned. Furthermore, in connection with the consideration for that contract between M–B and TUFCO (insofar as it is to be considered *inter-se* between these two contracting parties), it became the right of the latter to take as its own all the production which might be realized with a price specified. That price, though having reasonable relation to the market price for oil and gas at time the contract was executed, was unalterable until such time as TUFCO should recover its expenses of development. Disregarded by the M–B-TUFCO contract was any right of the Claytons to receive their royalty payments at a market price.

TUFCO began operations, drilling some wells which were productive and some which proved to be "dry holes". By its contract with M–B, TUFCO was entitled to be reimbursed its expenses in drilling "dry holes", and also its expenses in drilling productive wells. That entitlement, by the M–B-TUFCO contract, became one of the occasions for complaint by the Claytons.

As a result of the "Arab embargo" of late 1973 there was a substantial increase in the market prices for oil and gas. By the time of the venue hearing (upon Claytons' petition filed October 31, 1977), the market price for gas was three times greater than the price by which M–B was bound in con-

nection with its contract with TUFCO, at least for periods with which we are concerned.

The Claytons' attorney was asked during the venue trial to state the alternate counts of the petition for relief, and he did so, to-wit:

"Count No. 1 is a trespass to try title count, in which we sue for the recovery of the land and sue for damages for the invasion of the corpus of the land and removal of natural gas therefrom. In the second count as alternative count we sue for a cancellation of an oil, gas and mineral lease for fraud and fraudulent concealment of material facts, for fraudulent conduct subsequent to the execution of the lease as grounds for cancellation of the lease. We also sue for removal of cloud on title as a part of such count. The third count is also a suit to cancel the lease but alleges as grounds independently of the ground to cancel the lease for fraudulent inducement of the lease, that we are equitably entitled to cancel the lease because of the fraudulent acts of the defendant in the execution of the conspiracy to defraud the plaintiffs by means of a sweetheart gas purchase contract permitting confiscation of the gas and gas products for a small fraction of the true value. And in the fourth count—and this is a suit for a breach of an implied obligation if not an express obligation on the part of the defendants to use good faith in the performance of the obligation of the defendants under the oil, gas and mineral lease if the same should be held not subject to cancellation, which is the primary cause of action, and in that connection we have alleged that by reason of the lack of good faith that we were deprived of the market value of gas of more than three times the price of gas received and we sue for the recovery of damages for that breach of good faith in carry (sic) out the obligations of the defendants under the contract and exemplary damages because of the conspiracy. In the fifth count, also as an alternative count, aside from the question of failure

to use good faith, we allege that the defendant and each of them were guilty of gross negligence in the marketing of the gas from the lease and are in the further alternative that they were guilty of ordinary negligence in the marketing of such gas because we allege that had they used no due diligence or any kind of diligence at all and refrain from self-dealing in the sale of that gas, that the price would have been far, far above what was actually received and we allege in the count for gross negligence, in the alternative negligence. We have alleged that we are entitled to damages in the sum of a million dollars. In the sixth count, also as an alternative count, we have asked appointment of a receiver to take charge of the oil, gas and mineral estate in the land and to take possession of and market the gas pending the final disposition of the suit. . . ."

M–B responded to the Claytons' suit, insofar as it obtained against them, by filing the usual type of Plea of Privilege, adding the following: "The allegations made by the plaintiffs in regard to their alleged cause of action in trespass to try title and for cancellation of the oil, gas and mineral lease are not made in good faith or for probable cause but merely in a fraudulent effort to maintain venue in Jack County. The true nature of the plaintiffs' cause of action and their real purpose in filing this suit is for the recovery of additional royalty for gas produced by the defendants . . . Venue in such an action, as against these defendants, lies in Wichita County, Texas, the county of residence of each of these defendants." See 1 McDonald, Tex.Civ. Practice, 1965 Rev., p. 603, "Venue", § 4.51 "Reply to Controverting Affidavit".

TUFCO responded to the suit, insofar as it obtained against them, by filing the usual type of Plea of Privilege, adding the following: "The allegations made by Plaintiffs relating to trespass to try title and for cancellation of the lease in question have no foundation in fact or in law and were not made in good faith but purely for the purpose of attempting to maintain venue in Jack County, Texas." TUFCO stated its residence as in Dallas County, Texas.

In their controverting affidavit to the Pleas of Privilege the Claytons relied upon V.A.T.S. Art. 1995, "Venue", and its subdivision 14, "Lands", along with subdivision 7, "Fraud and defalcation"; 23, "Corporations"; and 29a, "Two or more defendants" (none of whom are residents in county where suit is brought). We hold exception 23 to be inapplicable; we hold 29a to be applicable only in the event venue as against M–B may be retained in the county of suit under some other exception to the rules applicable to general venue (which we hold proper by exception 14 on "Lands", though TUFCO is likewise proper to be held by exception 14). We hold, by reason of the failure in the Claytons' evidence to establish the required elements of actionable fraud that they failed to establish right to retain venue under exception 7 on "Fraud".

This leaves exception 14, "Lands" and it is thereunder we hold the Claytons did prove a right to retain venue in the county of the suit. Their parol evidence showed land location in Jack County and by the allegations of their petition that the suit was for the recovery of an interest in land located in Jack and Palo Pinto counties; and that the adjudication upon the Jack County land (in the county of suit) controlled, as well, as applied to the Palo Pinto County land. This we held in *Leonard v. Carter*, 389 S.W.2d 147 (Tex.Civ.App. —Fort Worth 1965, writ dism'd). In that case we were concerned with the question of "main purpose" of a plaintiff's suit, not the matter of proof made necessary by a defendant's allegation in a plea of privilege of a "want of good faith". A question upon "main purpose" exists in the instant case also, presumably ruled upon by the trial court in the retention of venue, presumably by exception 14. We hold no error in the ruling. Of course it is the complete rescission of contract of lease as the ultimate in relief that the Claytons seek. They may eventually show themselves to possess a remedy which is not so drastic. That this might occur could not control nor impair a ruling upon "main purpose".

Under exception 7, "Fraud, etc.", the plaintiff was obliged to prove that there was fraud in inducing them to make the lease, i. e., that actionable fraud occurred in the county of venue inducing action which the Claytons would not have undertaken but for reliance thereon. 1 McDonald, Tex. Civ.Practice, 1965 Rev., p. 463, "Venue", § 4.13, Art. 1995(7), "Fraud; . . . ." Our holding, already once stated, is that the Claytons failed to make out a *prima facie* case against TUFCO by evidence to be considered under this exception.

■ Were the whole contention of right to retain venue in the county of suit dependent upon the proof of such actionable fraud plaintiffs could not be said to have established their right to have venue in the county where they had filed their suit. However, we hold that where the suit is for the recovery of an interest in land due to the very same fraud the plaintiffs do not have the duty to discharge the identical burden by evidence on hearing. Because the suit is for land it is the pleadings, and the good faith in facts pleaded, which is determinative of the Claytons' right to have venue retained. Application of the rule to the instant case would mean the Claytons were obliged to merely prove that their allegations were not made in bad faith.

"Bad faith", as a term, is the antithesis of "good faith" under like circumstances and conditions, carrying with it a suggestion of dishonesty. *Fenner v. American Surety Co. of New York*, 97 S.W.2d 741 (Tex.Civ.App. —Dallas 1936, aff'd at 133 Tex. 37, 125 S.W.2d 258 (1939)). What is written both by the Dallas Court of Civil Appeals and by the Commission of Appeals for the Supreme Court upon the matter of good faith and bad faith, and what those terms mean, are of controlling import as applied to the meaning to be attributed thereto in this venue case. (Of course the consideration in *Fenner* relative to the burden of proof would not have application to the circumstances of the instant case before us on appeal.) The Commission of Appeals stated, as applied to a purchaser of a negotiable instrument, "Unless the purchaser has actu-

al knowledge of facts and circumstances that would render the paper noncollectible or has knowledge of such facts as that a purchase of the instrument would amount to bad faith, it is immaterial that he has notice of such facts as would put a reasonably prudent person on inquiry, and that such inquiry would lead to discovery. . . . To serve as evidence to support a finding of bad faith, the unheeded suspicious circumstances must be of a substantial character and so strong that bad faith rather than merely negligence can reasonably be inferred from them."

The *Fenner* case returned once again to the appellate courts. *Fenner v. American Surety Co. of New York*, 156 S.W.2d 279 (Tex.Civ.App.—Waco 1941, writ ref'd w. o. m.). In the second trial the definition of the term "bad faith" had been given in the Court's Charge as follows: "You are instructed that the term 'bad faith', as used in this charge, means that the person taking the instrument must have had knowledge of such substantial facts and circumstances as to create in his mind a suspicion that there was something wrong with the title of the person from whom he takes it, to the instrument itself, or to the money represented by such instrument, combined with an intentional disregard of and refusal on the part of the taker of the instrument to learn the facts from the means of knowledge which he knows are at hand." The definition was approved by the Waco Court of Civil Appeals. In a discussion the court stated: "To serve as evidence to support a finding of bad faith, the unheeded suspicious circumstances must be of a substantial character and so strong that bad faith rather than merely negligence can reasonably be inferred from them". (Quoted from *West v. First Baptist Church of Taft*, 123 Tex. 388, 71 S.W.2d 1090, 1097 (1934).) Further, it was remarked that: "It appears to have been decided by the great weight of authority that wilful ignorance is the equivalent of bad faith; and that bad faith may be shown by a wilful disregard of and refusal to learn the facts when available at hand"; and further, "The rule may perhaps be said to resolve itself into a question of

honesty or dishonesty, for guilty knowledge and wilful ignorance alike involve the result of bad faith. They are the same in effect. . . . "

Certainly may the presence or absence of "good faith" become a question of fact. Such was the circumstance in the *Fenner* case, for the issue there was one for the jury.

In the case before us both M–B and TUF-CO contend that there was no evidence whereby the trial court could have found "good faith" in the allegations of the Claytons which conferred venue upon the trial court. If the issue was raised then there was evidence supporting retention of venue and the presumed fact finding by the trial court that the Claytons' allegations were made in good faith is to be sustained. There is not a contention that the trial court's finding was contrary to the greater weight of the evidence adduced on trial.

 Under the circumstances, already noticed, the Clayton's right to maintain suit for the recovery of interests in land depends upon their proof of actionable fraud in the inducement to lease the property in 1972. The fact that there was failure to prove actionable fraud on the venue hearing (and as a consequence an inability to demonstrate the right to retain venue in the county of the suit under exception 7 on "Fraud") does not establish—as a matter of law—that there were fraudulent averments in the Claytons' petition or any pleading in want of their good faith.

As we view the situation: It could only be where the evidence shows that a plaintiff whose material allegations are under attack, knew them to have been false, when made and/or at time of the venue hearing, that they could be held in bad faith as a matter of law; otherwise, and when that is not shown, there would be merely presented an issue of fact to be determined by the fact finder if the plaintiffs' evidence shows any good faith. Though a plaintiff's hopes of making proper proof of the case plead at time of a trial on the merits might be shown to be probably incapable of fulfill-

ment his allegation of such facts in his pleadings should nevertheless be deemed to have been made "in good faith" so long as he might be held to have any justified reason to hope that at such time the requisite evidence would be available.

In this case, though actionable fraud in the inducement to contract was not proved upon the venue hearing, it may become possible to be proved by the Claytons at time of the trial on the merits. At least the contrary was not shown. Under these circumstances there was no error by the court in rendering a decree which retained venue in the county of suit.

We affirm the judgment.